# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-DP-01315-SCT

*LAWRENCE BRANCH*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 05/23/2002 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | CARROLL COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF CAPITAL POST-CONVICTION COUNSEL |
| | BY: JAMES LAPPAN |
| | CANDY LAWSON |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MELANIE KATHRYN DOTSON |
| | JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED - 05/27/2004 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1. Upon finding Lawrence Branch guilty of the crime of capital murder for the January 21, 2001, killing of Dorothy Jorden, the same jury imposed the death penalty. On this direct appeal, Branch is now represented by the Mississippi Office of Capital Post-Conviction Counsel. Branch raises nineteen issues in this appeal. Finding no reversible error, we affirm Branch's conviction and sentence.

**FACTS**

¶2.     On January 20, 2001, after working the 3-11 p.m. shift at Heatcraft in Grenada, Lawrence Branch drove to the home of his cousin, Deondray Johnson. When Johnson got into Branch's car, he was carrying a piece of furniture wood that had been lying in Johnson's yard. Branch did not ask any questions. The two then went to Dot's Burger Bar ("Dot's"), a restaurant and club in Coila owned by the victim Dorothy Jorden, age 57. Jorden lived in a house adjacent to Dot's. While at Dot's, the two played pool and drank beer. There was also a card game in which Jorden won money. Branch and Johnson stayed until closing.

¶3.     At approximately 1:30 a.m., Branch and Johnson had agreed to give two fellow patrons, Mary Jenkins ("Punkin") and Anthony Gatewood, a ride home. Before leaving, they had also promised to return and give Johnson's mother, Janie Johnson, a ride home. Branch never returned to give Johnson a ride home.

¶4.     This is where the Branch's retelling of the events of the evening diverge. There are three versions: one Branch told police on January 21 during their first encounter; one Branch told the police during their second meeting on January 21 which was videotaped; and the one Branch told during the suppression hearing and at trial. What is known is that about 4:00 p.m. on January 21, Jorden's body was found inside her home in a pool of blood. It became apparent that she was beaten in the head outside because there was a bloody indentation in the ground about the size of an adult head. Jorden's earring was found in that indentation. A broken stick of wood was found in the woods.

¶5.     The police began speaking to everyone who had been at the club the night before, the last two interviewed were Branch and Johnson. Carroll County Sheriff Donald Gray and Deputy Eddie Corley went to Branch's home and requested that Branch come to the station to answer some questions. Branch told them that he had to go to work, and they assured him that he would be back in time. The Sheriff took the

clothing that Branch said he wore the night before. At the same time, Deputies Spellman and Michael Peeples went to Johnson's house and brought him in for questioning. While at the Johnson home, the officers found wood which appeared to be identical to the broken stick found in the woods. They also took the clothing Johnson wore the night before.

¶6.     This is what Branch told the officers at the station, according to Deputy Spellman: Branch and Johnson drove Punkin and Gatewood to their home. After talking to Gatewood, they forgot to return to pick up Johnson's mom. They went to Winona and then a club called "51" where they stayed about an hour to an hour and a half. When they left, they went to a girl's house and stayed for an hour to an hour and a half, then went home.

¶7.     After telling this version to the police, Branch was returned to his home so that he could get ready for work. Afterwards, the police questioned Johnson. Because the two admitted being together all evening and their stories did not "match," the Sheriff telephoned Branch at work and said that he would come pick Branch up for more questioning. One item that raised suspicion was that the police knew there had been some problems with the club on Highway 51 in the past and that deputies regularly go to the club around 2 a.m. to insure that it closes and people leave. Branch's version would have put the two at the club after closing time.

¶8.     At the suppression hearing and at trial, Branch described this encounter as follows: Deputies Michael Spellman and Robert "Pop" Miskelly came to his work. Branch went outside with them. Before being put into the vehicle, Spellman told him that they were putting handcuffs on him for the safety of him and the officers. The handcuffs were placed in the front of Branch's body. Spellman immediately began asking questions and told Branch that his and Johnson's stories did not match. Spellman began swearing

3

at him and stopped the car at which time he waved his gun in the rearview mirror. Spellman also told Branch that the house that recently burnt down was not an accident. Branch knew that an adult and child died in that house fire. Spellman went on to say that Branch would not want anything like that to happen to the pretty little house on the hill. Branch felt Spellman was talking about his parent's home where Branch and his family lived. Then Spellman told Branch what to say once they got to the station. While the camera was on, Branch just repeated everything Spellman told him to say.

¶9.     Deputy Spellman admitted to talking to Branch in the car from Grenada to the station, but denied threatening him, stopping along side the road at any point, or even talking about the case. Branch began talking, but Deputy Spellman told him to wait until they arrived at the office. The videotape reveals Branch describing the events after he and Johnson left Dot's as follows: After dropping off Punkin and Gatewood, Branch and Johnson stopped on the side of the road and walked through the woods where they discussed robbing Jorden. They watched Jorden leave, giving Johnson and a male companion a ride home. The two moved closer to the house. When Jorden returned, Johnson was near a vehicle already parked in the yard and Branch was alongside the house. Jorden got out of her truck and walked up to the door, unlocking it. However, instead of going in, she returned to the truck. That is when Johnson came up from behind and struck Jorden. Branch says that he "heard her holler. Then I came from around the edge and I heard them tussling to the ground. And [Johnson] hit her a couple of times, and I hit her a couple of times. And I was just holding her down. I hold her down where I could get the money out of her pocket." Branch was shown the stick that was found and he told the officers that "that is part of it." He later indicated that he hit Jorden three times and Johnson hit Jorden three times. Then they drug her body into the house and sat her up on the floor. After searching for more money, they left with approximately two hundred dollars and

4

Jorden's pistol. When they got back to the car, they checked each other for blood. Johnson did not have any blood on him, but Branch did. They went into the woods where Branch removed and burnt his clothes. Then, they went on to Grenada where they ate breakfast.

¶10.    At the trial, Branch testified to the events after leaving Dot's as follows: After dropping Punkin and Gatewood off at their house, Branch and Johnson just drove up the road to Winona. They were talking about a club called "Trick Daddy" but instead went to "51," which was closed. They followed the people leaving the club to a Texaco store in Winona. They hung out in the parking lot until they followed two girls, Rose and Bird, to their house. After that, Branch and Johnson drove to Grenada where they got gas, went to Wal-Mart, then ate at the Huddle House. Then, Branch took Johnson home. Upon leaving Johnson's house, Anthony Hays asked Branch to take him home, which Branch did. Branch then returned to his own house.

¶11.    Several days after Branch's arrest, Branch's father, Willie Branch, found a white plastic bag in high grass and weeds on the Johnson's property. (The Johnson and Branch families live next door to each other.) Branch's counsel, Ms. Crawford and Mr. Osborne, contacted the Sheriff and arranged to meet the following morning. Willie Branch and Branch's attorneys turned the bag into the Sheriff. The bag contained a pistol, money, food stamps, and coin wrappers.

¶12.    The autopsy performed by Dr. Steven Hayne revealed that Jorden died from closed head injuries secondary to blunt force trauma. Based upon the bruising and tearing of the flesh, Dr. Hayne estimated that Jorden was struck approximately five to six times on the top of the head and that these blows would have required a considerable amount of force. Defensive wounds found on Jorden indicate that she was conscious during at least part of the attack.

5

¶13.   Evidence of blood was found on Johnson's clothing.  DNA comparison revealed that the blood was Jorden's.  Jorden's blood was also found on the broken stick. Tests also confirmed that the two pieces of wood found previously constituted one piece and that both pieces were consistent with other wood found at Johnson's home.   Johnson's palm print was found on one of the food stamps within the white bag found by Willie Branch.  The pistol found in the bag was traced back to Jorden through the serial number.

## PROCEEDINGS

¶14.   Branch was indicted in the Circuit Court of the First Judicial District of Carroll County  for capital murder with the underlying felony of robbery.  Johnson was also indicted, but tried separately.  Johnson's proceedings are not at issue in this appeal.  Branch's pretrial hearings and  jury trial were conducted before Judge C. E. Morgan, III.  After one and one-half hours of deliberation, the jury returned a guilty verdict. The sentencing phase began the following morning and resulted in the death penalty.

¶15.   The Mississippi Office of Capital Post-Conviction Counsel was appointed to represent Branch in this direct appeal  Along with the filed briefs, Branch has submitted an Appendices to the Original Brief of Appellant, which includes affidavits from W. Criss Lott, Ph.D., who performed a forensic mental evaluation of Lawrence Branch;  W.S. Stuckey, Jr., defense co-counsel at trial; Ernestine Branch, Branch's mother; Willie Branch, Branch's father; Steven Branch, Branch's 22-year-old brother; Queena Branch, Branch's 21-year-old sister; Branch's cousins Zackareah Branch and Cedric Blackmon; elementary school teachers Mary Fluker, Annie Shack, Eula Phillips, Carla Rogers, Mary James Wilson,  Bonnie Johnson, and Alisa Archie; and defendant.  Also attached was the judgment whereby Deondray Johnson was found guilty of capital murder and sentenced to serve life imprisonment without parole because the jury was "unable to agree unanimously on punishment."

¶16. The following are the issues raised on appeal, as worded by Branch's counsel:

I. The Eighth and Fourteenth Amendments to the United States Constitution and Article Three, Section Twenty-Eight of the Mississippi Constitution forbid the Execution of Lawrence Branch as Branch is mentally retarded.

II. Branch was denied effective assistance of counsel under *Strickland v. Washington* at all stages of this prosecution.

A. Penalty Phase.
  1. Failure to Introduce Evidence of Mental Retardation
  2. Failure to Introduce Evidence Mental Health Mitigation
  3. Failure to Investigate
  4. Failure to Advocate
  5. Failure to Prepare Penalty Phase Witnesses
  6. Ineffective Performance at Charge Conference
  7. Additional Deficiencies/Cumulative Error

B. [Guilt] Phase.
  1. *Batson*
  2. Failure to present mental retardation at suppression and at trial.
  3. Failure to defend allegation that Johnson's clothes had victim's blood on them
  4. Failure of Crawford to withdraw after becoming an authentication witnesses

C. Prejudice

III. Branch's Eighth Amendment right to remain free from cruel and unusual punishment under *Caldwell v. Mississippi* and his due process rights to a fundamentally fair sentencing hearing were violated when Mr. Branch's attorney likened death by lethal injection to putting a sick animal to sleep, when Mr. Branch's attorney opined that a death sentence was more lenient than a life sentence, and when Mr. Branch's attorney imparted that individuals who are sentenced to death nonetheless remain alive for years.

IV. Eighth Amendment violations based on deficient performance of counsel mandate the death sentence be vacated.

V. As a result of Claim II and III, counsel was ineffective at the penalty phase under *United States v. Cronic*.

7

VI.     Pursuant to Subsections (3)(a) and (3)(c) of Miss. Code Ann. § 99-19-105, the death sentence is arbitrary, excessive, and disproportionate and Mr. Branch seeks modification of his sentence under Miss. Code Ann. § 99-19-105(c).

VII.    Mr. Branch's Sixth and Fourteenth Amendment Rights and the Fourteenth Amendment Rights of minority venire members were violated under ***Batson v. Kentucky***.

VIII.   The trial court erred in allowing the introduction of victim impact testimony at sentencing.

IX.     Trial court erred in refusing to give defense sentencing instructions DS-1, DS-5, and DS-10 and this error was not corrected by advising defense counsel of his ability to argue substance during summation.

X.      Trial court erred in refusing to give defense sentencing instructions DS-1 in that DS-1 advised the jury as to the burden of proof.

XI.     Trial court erred in refusing to give defense sentencing instruction DS-2 in that DS-2 provided a constitutionally required definition of "mitigating circumstance."

XII.    Branch was denied due process in that the state failed in its burden to show that death was the appropriate sentence in this case.

XIII.   The trial court erred in allowing the jury to consider the unconstitutionally duplicative aggravating circumstance of the felony of robbery/pecuniary gain, which was also used to elevate the crime to capital murder.

XIV.    The trial court erred in allowing the jury to consider the invalid combined aggravator of robbery and pecuniary gain, which the jury used in support of a sentence of death, denying Branch a reliable sentence as guaranteed by the United States and the Mississippi Constitutions.

XV.     The prosecutor committed plain reversible error during guilty closing argument and sentencing closing argument by improper and unfairly prejudicial comments and as a result, Mr. Branch was denied a fundamentally fair trial.

XVI.    The trial court erred in failing to instruct the jury on all three sentencing options available under Miss. Code Ann. §§ 97-3-21 and 99-19-101.

XVII. The aggregate error in this case requires reversal of the conviction and death sentence.

XVIII. Miss. Code Ann. 99-19-101 is facially unconstitutional.

XIX. Mr. Branch's conviction is unsupported by the evidence adduced at trial and is against the overwhelming weight of the evidence.

## ANALYSIS

¶17. The State challenges Branch's appendices which were not part of trial record. According to the State, these documents are barred from consideration. *Wansley v. State*, 798 So.2d 460, 464 (Miss. 2001). However, Branch is not represented by the same counsel. Initially, Branch was represented by Callestyne Crawford and Solomon Osborne. Prior to trial, Osborne was replaced by W. S. Stuckey. The Office of Capital Defense Counsel was appointed for this direct appeal. We note M.R.A.P. Rule 22(b):

> Issues which may be raised in post-conviction proceedings may also be raised on direct appeal. Where the appellant is represented by counsel who did not represent the appellant at trial, the failure to raise such issues on direct appeal shall constitute waiver barring consideration of the issues in post-conviction proceedings.

If new counsel on direct appeal is required to assert collateral claims, there must be an opportunity to submit extraneous facts and discovery and evidentiary hearing to develop and prove the allegations. *See Brown v. State*, 798 So.2d 481, 491 (Miss. 2001) (citing *Smith v. State*, 477 So.2d 191, 195 (Miss. 1985) and *Turner v. State*, 590 So.2d 871, 874 (Miss. 1991)); *Jackson v. State*, 732 So.2d 187, 190 (Miss. 1999).

¶18. We have stated that "there is conflicting authority on whether this Court should apply the procedural bar" in a post-conviction relief case raising ineffective assistance of counsel on direct appeal. *Goodin v. State*, 856 So.2d 267, 279 (¶ 30) (Miss. 2003). Goodin was then permitted to proceed on the issue of

9

ineffective assistance of counsel and was granted an evidentiary hearing to determine whether he was "mentally retarded within the meaning of *Atkins*." Although this case is a direct appeal, Branch is represented by counsel who did not represent him in the trial court. Branch must raise *Atkins* and ineffective assistance of counsel issues in this direct appeal or he will be barred from doing so in subsequent appeals. Therefore, we will permit Branch to proceed with these issues, and we will consider the additional documents supplied in Appendices to Original Brief of Appellant.

## I. Mental Retardation.

¶19. On June 20, 2002, the United States Supreme Court ruled in *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), that the execution of mentally retarded offenders amounted to cruel and unusual punishment and was, therefore, prohibited by the Eighth Amendment to the United States Constitution. The Eighth Amendment has been incorporated by the Fourteenth Amendment. *Robinson v. California*, 370 U.S. 660, 667, 82 S.Ct. 1417, 1421, 8 L.Ed.2d 758 (1962). "Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317. Determination of who is mentally retarded was left up to the states. *Id*.

¶20. Branch is procedurally barred because this issue was not raised at trial. *See Moawad v. State*, 531 So.2d 632, 634 (Miss. 1988) (trial judge cannot be put in error on matter not presented for decision); *Walker v. State*, 823 So.2d 557, 561 (¶ 6) (Miss. Ct. App. 2002) (failure to raise issue at trial court level bars consideration at appellate level). Also, *Atkins* is not an intervening decision since it was decided prior to Branch's Motion for New Trial. *Atkins* was decided June 20, 2002, and the trial court ruled on

Branch's motion on July 16, 2002. Inasmuch as this issue is raised in the direct appeal of a capital case, this Court will consider the merits of Branch's argument.

¶21. This Court has adopted the American Association of Mental Retardation definition:

> The American Association of Mental Retardation (AAMR) defines mental retardation as follows: "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). "Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.

*Goodin v. State*, 856 So.2d at 275 (¶ 16) (quoting *Atkins*, 122 S.Ct. at 2245 n.3). The burden of proof is on the defendant claiming mental retardation. *Goodin*, 856 So.2d at 276 (¶ 22). In *Goodin*, we pointed out that:

> The Legislature adopted the following standard in Miss. Code Ann. § 41-21-61(f) (Rev. 2001), dealing with commitments, which states in part:
>
> > (f) "Mentally retarded person" means any person (i) who has been diagnosed as having substantial limitations in present functioning, manifested before age eighteen (18), characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self- care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work....

11

***Goodin***,  856 So.2d at 276-77 (¶ 23).

¶22.    Branch argues that he is mentally retarded and, therefore, cannot be executed for this crime.  In support of his argument, Branch relies solely on the Psychological Evaluation performed by the Region VI Mental Health-Mental Retardation Center on March 15, 1985, and the synopsis of that diagnosis in the 2002 court-ordered evaluation performed after Branch was arrested.  Both documents were available to trial counsel; however, apparently as part of a trial strategy, neither document was used in the trial of this case.

¶23.    At the time of the 1985 evaluation, Branch was five years, three months old.  Then seventeen years later and after his arrest in this case, the trial court ordered W. Criss Lott, Ph.D., a clinical psychologist, to perform a mental evaluation on Branch.  In doing so, Dr. Lott acknowledged the previous testing:

> On that evaluation [Branch] obtained an IQ of 68 on the Stanford-Binet Intelligence Scale, Form L-M.  He also obtained an IQ of 41 on the Peabody Picture Vocabulary Test, Form B, and a Social Age Equivalent of 6.0 and Social Quotient of 113 (this appears to be a mistake).  He also obtained a mental score of 3 years 6 months on the Goodenough-Draw-A-Man-Test.  At that time he received the diagnosis of mild mental retardation with unknown etiology.

However, the March 10, 2002, forensic mental evaluation of Branch reveals a different result.  Branch was administered two separate tests.  The Wechsler Adult Intelligence Scale-III (WAIS-III) revealed a verbal IQ of 91 (low average range), a performance IQ of 76 (borderline range), and a full scale IQ of 84 (low average range).  The Wide Range Achievement Test-III (WRAT-3) revealed a reading score in the average range and at the high school level; the arithmetic score was in the low average range and at a sixth grade level.  Dr. Lott indicated that "the results are considered an accurate reflection of his current level of functioning."

12

¶24. While Branch may have manifested intellectual limitations at the age of five, he does not have substantial limitations in present functioning which "exist[] concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self- care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure and work." In fact, Branch has displayed no limitations in these adaptive skills areas. At the time of the evaluation, Branch was appropriately groomed and properly maintained personal hygiene, possessed a driver's license, was responsible for buying clothing, groceries, and personal items. He completed school through the 9th grade and attended GED classes. Branch was employed at the time of his arrest. Branch performed household chores for relatives and people in the neighborhood. He helped raise money for the church and community.

¶25. Under these facts, Branch has not made a prima facie showing that he falls within the category of persons protected under *Atkins*. Under the guidelines of the American Psychiatric Association, Branch only meets the third criterion, that consisting of an onset of the manifestation prior to age 18; however, Branch fails to meet either of the first two criterion. Therefore, this issue is without merit.

## II.     Effective assistance of counsel under *Strickland v. Washington*.

¶26. Branch alleges that he was denied effective assistance of counsel under *Strickland v. Washington* during all stages of his trial. This issue will be addressed in two parts: the penalty phase and the guilt phase. The standard for evaluating an ineffective assistance of counsel claim is well settled:

> Where ineffective assistance of counsel is alleged, "the benchmark [ ] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). In addition, the defendant must show that the counsel's performance was deficient and that the deficiency prejudiced the defense of the case. *Id.* at 687, 104 S.Ct. 2052. In order to show

13

prejudice under the ***Strickland*** standard, the [defendant] must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Id.*** at 694, 104 S.Ct. at 2068. A defendant must make both showings under ***Strickland***, otherwise, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." ***Jones v. State***, 857 So.2d 740, 745 (Miss. 2003) (quoting ***Stringer v. State***, 454 So.2d 468, 477 (Miss. 1984)).

***Harris v. State***, 861 So.2d 1003, 1018 (¶ 39) (Miss. 2003). Trial counsel is presumed competent, and the burden of proving that counsel's performance was deficient and prejudicial falls upon the Appellant. ***Hansen v. State***, 649 So.2d 1256, 1258 (Miss. 1994). There is no constitutional right then to errorless counsel. ***Stack v. State,*** 860 So.2d 687, 696 (¶ 20) (Miss. 2003); ***Cabello v. State***, 524 So.2d 313, 315 (Miss. 1988); ***Mohr v. State***, 584 So.2d 426, 430 (Miss. 1991) (right to effective counsel does not entitle defendant to have an attorney who makes no mistakes at trial; defendant just has right to have competent counsel).

¶27. When evaluating the overall performance of counsel, counsel must make strategic discretionary decisions including whether or not to file certain motions, call certain witnesses, ask certain questions, or make certain objections. ***Cole v. State***, 666 So.2d 767, 777 (Miss. 1995). In gauging counsel's performance, we must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." ***Stringer v. State***, 454 So.2d 468, 477 (Miss. 1984) (citing ***Strickland***, 466 U.S. at 689).

### A. Penalty Phase.

¶28. During the penalty phase, Branch contends that he received ineffective assistance of counsel by his counsel's: (1) failure to introduce evidence of mental retardation; (2) failure to introduce evidence of

14

mental-health mitigation; (3) failure to investigate; (4) failure to advocate; (5) failure to prepare penalty phase witnesses; (6) ineffectiveness at charge conference; and (7) additional or cumulative error. Each sub-issue will be addressed separately.

### 1.     Evidence of Mental Retardation.

¶29.    Branch claims that his counsel was deficient in failing to introduce mitigation evidence of mental retardation during the penalty phase. Branch cites **Brownlee v. Haley**, 306 F.3d 1043, 1073 (11th Cir. 2002); **Coleman v. Mitchell**, 268 F.3d 417, 449-53 (6th Cir. 2001); **Glenn v. Tate**, 71 F.3d 1204, 1205 (6th Cir. 1996); **Zant v. Pitts**, 263 Ga. 529, 436 S.E.2d 4, 5 (Ga. 1993); **Commonwealth v. Smith**, 544 Pa. 219, 245, 675 A.2d 1221, 1234 (1996). Again, Branch is relying on the 1985 diagnosis of "mild mental retardation." However, that evaluation is contradicted by the more recent evaluation, which reveals an IQ of 84. Certainly the decision to introduce the 1985 diagnosis could be considered a reasonable strategic decision made by trial counsel inasmuch as had the evaluation been introduced, the State would have rebutted with the 2002 evaluation which found that Branch is not mentally retarded. Additionally, Dr. Lott's evaluation also indicates certain untruths, such as whether Branch had ever undergone psychological testing or had a history of mental health treatment. The State points out that this information could have been perceived as a "lie" by the jury.

¶30.    There is also a contradiction in Branch's testimony given in the guilt phase and what Branch reported to Dr. Lott with regard to Branch's height and weight. Dr. Lott's report reveals that Branch reported that he is 6'2" and weights 190 pounds; however, when asked on cross-examination of his height and weight, Branch testified that could not remember. This question was elicited by the State to compare

15

the size of Branch with the female victim. This evidence could be considered "double-edged." *See Barrientes v. Johnson*, 221 F.3d 741, 774 (5th Cir. 2000);*Dowthitt v. Johnson*, 230 F.3d 733, 745 (5th Cir. 2000); *West v. Johnson*, 92 F.3d 1385, 1409 n.46 (5th Cir. 1996).

¶31. Because Branch's claim for protection under *Atkins* fails, the claim of ineffective assistance of counsel based upon the failure to introduce the 1985 evaluation must also fail.

### 2. Mental Health Mitigation Evidence.

¶32. Branch claims that his counsel was deficient in failing to introduce evidence of mental health mitigation and he lists thirty-four items arising from Dr. Lott's report and the attached 1985 evaluation. Branch claims that mental-health mitigation is "one of the weightiest mitigating factors." *Santos v. State*, 629 So.2d 838, 840 (Fla. 1994). Branch argues that his claim is further supported through the testimony of defense witnesses because they failed to mention his mental health. However, we find that trial counsel made a strategic, tactical decision not to introduce the 1985 evaluation. This evidence is contradicted by the 2002 evaluation, which presents a strong case that Branch is not mentally retarded, evidences that Branch was untruthful in his trial testimony, and affirmatively shows that Branch's confession was not coerced. By introducing the school records, defense counsel would have shown that Branch received grades in the range of 71 to 87 in his GED classes.

¶33. Therefore, we find that this issue is without merit.

### 3. Investigation.

¶34. As to Branch's claim that his trial counsel failed to perform an investigation, Branch requests that this Court not evaluate what evidence the counsel presented, but rather what was not. In addition to the

*Atkins* and mental health information, trial counsel made no motion for investigator nor provided any

testimony from relatives or elementary teachers other than three witnesses during each phase. Branch now

provides affidavits from family members and teachers who now indicate that they were willing to testify on

behalf of Branch.

¶35.     *Wiggins v. Smith*, 529 U.S. 510, 123 S.Ct. 2527, 2537, 156 L.Ed.2d 471 (2003), addresses

whether capital counsel's performance was the culmination of trial strategy or the natural result of inattention

which falls below professional norms. There the Court stated:

> In assessing counsel's investigation, we must conduct an objective review of their
> performance, measured for "reasonableness under prevailing professional norms,"
> *Strickland*, 466 U.S., at 688, 104 S.Ct. 2052, which includes a context-dependent
> consideration of the challenged conduct as seen "from counsel's perspective at the time,"
> *id.*, at 689, 104 S.Ct. 2052 ("[E]very effort [must] be made to eliminate the distorting
> effects of hindsight").

*Wiggins v. Smith*, 123 S.Ct. at 2536. Branch cites numerous cases in support of his argument: *Lockett*

*v. Anderson*, 230 F.3d 695, 711 (5th Cir. 2000); *Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994);

*Stephens v. Kemp*, 846 F.2d 642, 653 (11th Cir. 1988); *see also Hill*, 28 F.3d 832 (8th Cir. 1994);

*Jones v. Thigpen*, 788 F.2d 1101 (5th Cir. 1986); *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct.

1495, 146 L.Ed.2d 389 (2000), *Silva v. Woodford*, 279 F.3d 825, 833 (9th Cir. 2002); *Emerson v.*

*Gramley*, 91 F.3d 898, 906 (7th Cir. 1996); *Hall v. Washington*, 106 F.3d 742, 749-50 (7th Cir.

1997); *Bouchillon v. Collins*, 907 F.2d 589, 594-98 (5th Cir. 1990); *Lawrence v. Armentrout*, 900

F.2d 127, 129-31 (8th Cir. 1990); *Wilderson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992);

*People v. Ruiz*, 686 N.E.2d 574, 582 (Ill. 1997).

¶36.     Prior to trial, Branch's lawyer, Callestyne Crawford, moved for appointment of co-counsel and cited the need as "counsel must supervise and assimilate facts developed by investigators;" however, there was never a motion or order for appointment of an investigator.  Branch contends that it is not apparent that any investigation was performed.  Branch has failed to show anything other then defense counsel "simply did not apparently call everyone who claims to be willing to testify as to [Appellant's] good character.  Thus, it is a stretch to blame trial counsel for not calling cumulative witnesses." *Davis v. State*, 743 So.2d 326, 351 (Miss. 1999) (Smith, J., dissenting).

¶37.     In this appeal, Branch has submitted the affidavits from the following people: W.S. Stuckey, Jr. (defense co-counsel at trial), Ernestine Branch (Branch's mother), Willie Branch (Branch's father), Steven Branch (Branch's 22 year old brother), Queena Branch (Branch's 21 year old sister), Zackareah Branch (Branch's cousin), Cedric Blackmon (Branch's cousin), Mary Fluker (an elementary school teacher who did not teach Branch but whose son has been friends with Branch since the fourth grade), Annie Shack (Branch's elementary school language teacher), Eula Phillips (an elementary school teacher who taught all three Branch children), Carla Rogers (Branch's elementary school remedial reading teacher), Mary James Wilson (Branch's second grade teacher), Bonnie Johnson (Branch's fifth and sixth grade teacher), and Alisa Archie (Branch's remedial math teacher).  Almost all of these affidavits are, in essence, affidavits from persons who now indicate that they were willing to testify on behalf of Branch as character witnesses. Stuckey claims that Ms. Crawford performed all of the investigation prior to him being appointed. With the exception of Branch's mother and father and Stuckey, the affiants state that they did not speak to Branch's trial counsel.  Branch also claims counsel should have introduced his entire report of school grades.

¶38.    This case shows that indeed there was an investigation performed. In Branch's case-in-chief, three people testified: Branch himself, his aunt Janie Johnson (co-defendant Deondray Johnson's mother), and Branch's father Willie Branch. During this portion of the trial, the defense strategy appears to be that Johnson killed Ms. Jorden, but not while he was with Branch. The trial counsel correctly pointed out that the only link the State had connecting Branch was the "coerced" confession.

¶39.    During the sentencing phase, three people testified: Branch's aunt Vearne Rias, Willie Branch, and John Jorden (the victim's husband). Ms. Rias testified that Branch was a very nice young man who respected older people and that Branch would assist her and others with chores without being asked. Branch's father testified of Branch's interests, including sports and charitable activities, and his demeanor. Willie Branch also testified about their home life and that he never had any trouble with his son. Mr. Jorden testified that he felt the appropriate sentence would be life without parole.

¶40.    The record also indicates that the trial counsel filed several pre-hearing motions, put on several witnesses in each phase of the trial, and zealously represented their client. Branch has not shown this Court anything the trial counsel could have or should have done. The witnesses now willing to come forward would have constituted redundant character testimony. Therefore, this issue is without merit.

### 4.    Advocacy.

¶41.    Branch next contends that his trial counsel failed to advocate for him at the sentencing phase during the opening statement and during summation and that counsel made a wholesale abandonment of him during summation. Branch bases this argument on three *Caldwell* errors (which is Branch's third assignment of error), forensic abandonment of mitigation testimony, omission of mitigating factors, failure to mention testimony of penalty phase witnesses, and no discernable tactic. In addition, Branch states that the

19

summation pleading for Branch's life only consisted of seven pages of transcript. This Court notes that the summation for the prosecution is not much longer in that it is 10 pages for both the initial and the rebuttal.

¶42. As to the opening statement, there were no opening statements given by either the prosecution or the defense. Opening statements are not mandatory. Miss. Code Ann. § 11-7-147. Failure to give an opening statement is not per se ineffective assistance of counsel. *Rushing v. State*, 711 So.2d 450, 458 (Miss. 1998). The United States Supreme Court found that there was no ineffective assistance of counsel claim where counsel did not give a closing statement or put on any mitigation evidence. *Bell v. Cone*, 535 U.S. 685, 122 S. Ct. 1843, 152 L.Ed. 2d 914 (2002).

¶43. As to the summation given by defense counsel, Branch asserts that Mr. Stuckey advocated against him; only briefly mentioned two of the three statutory mitigators; failed to mention father's testimony or any defense witnesses' testimony; admitted that Branch had previously used marijuana, and conceded to the only aggravating factor of pecuniary gain. Ms. Crawford made no summation at all. With the exception of the *Caldwell* errors, Branch contends that the remainder of counsel's performance was "banal" and that the summation displayed no discernable tactic.

¶44. However, counsel made nine points in the closing argument: 1) doubt as to Branch's guilt may still exist in the minds of the jury; 2) Appellant is only 22 years old and little more than a child; 3) a life sentence is a more severe punishment in cases such as this as Branch will never get out of jail; 4) Branch has no major prior criminal history; 5) the death penalty is reserved for truly depraved individuals such as serial and child killers; 6) Branch was not the mastermind of this crime as Johnson had both the murder weapon and the idea to rob Ms. Jorden; 7) the death penalty would be a merciful ending to Branch's life, which is not the way to punish him; 8) none of Ms. Jorden's relatives asked that Branch be put to death, but rather

20

asked for a life sentence; and 9) a life sentence is a sufficient deterrent to a crime such as this. Counsel admitted to the prior marijuana use because Branch admitted to smoking twice during his testimony; but this was a preemptive trial tactic in that the defense could raise the issue then dismiss it as insignificant. Additionally, the concession of the aggravating circumstance was already determined by the jury's finding beyond a reasonable doubt that Branch was guilty of capital murder during the guilt phase.

¶45.    As to counsel's summation, initially, he indicated that he jotted down some notes while driving to the courthouse that morning. When discussing the sole aggravating factor, counsel said "I will tell you right now, I think it was proved." In discussing mitigating factors, counsel stated "Nothing I say in the way of mitigating factors can ever be a justification or an excuse to kill somebody. Never, and I don't ever intend for it to sound like that. So don't put that on me." Then, in discussing the death penalty, counsel said:

> Let me digress a little bit to the last couple of days. Of course, Lawrence, you -- and you found that he participated in that killing. But when he picked up Deondray, Deondray was the one with the stick, not Lawrence. You can draw inferences by your common sense and every day life experiences. To me that means, and it may to you, that Deondray was the one who had the idea of robbing her in the first place. Now I think that what they intended to do was rob her, and somehow that got out of hand, and it went too far, and it ended up in a murder. And that's partly because of his age, and isn't it a comment about society. The younger you are; it seems the less value you put on life. I put a great deal of value on life, and I do not have to stoop to his value of life to make a decision on what I think is right. *He apparently had no value, placed little or no value on Dot's life*. I happen to place a great deal of value on anybody's life.
>
> Now let's talk about the two sentences. When the District Attorney says you don't want to punish him, I consider both sentences a death penalty. Life without parole in the penitentiary means just exactly what that phrase means. He will stay in the penitentiary until he is carried off in a pine box, dead. As a matter of fact, that's what the death sentence means too. One of them just happens to be longer than the other one. *What do you do when an animal is in pain, and you don't want it to suffer? You put it to sleep. That's essentially what they do now or what they are supposed to do when you get the death penalty. Of course, nobody has been executed in ten, twelve, thirteen years, however long it has been.*

21

\* \* \*

> I suggest to you if you are really mad at him, which you ought to be, for killing Dot and taking her life before her time, then make him remember it day by day, week by week, year by year sitting in that cell with no way out. Take from him bit by bit what he took from Dot in five minutes. And I think you will agree that of the two sentences, not only is it the correct one; but it's actually the one that I think punishes him more for what he did considering his age. Thank you.

(emphasis added). Counsel conceded the sole aggravating circumstance, which was pecuniary gain. Branch contends that by this concession, counsel conceded Branch's death eligibility status. *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L. Ed. 2d 750 (1994). Branch claims that while this may be a tactical decision, "it is particularly critical that an attempt be made to present and argue mitigating circumstances." *Smith v. Stewart*, 140 F.3d 1263, 1270 (9th Cir. 1998); *see Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir. 1988). There was very little attempt to argue mitigating factors and no mention of the testimony given during the trial or penalty phase, according to Branch.

¶46.    In viewing the summation as a whole, it appears that counsel was attempting to persuade the jury to select life imprisonment over the death penalty. Counsel had been viewed as an advocate for Branch throughout the guilt phase of the trial. A common defense tactic after the jury finds the defendant guilty of capital murder would be to do everything in that attorney's power to avoid the death sentence and, instead, to convince the jury to impose a life sentence.

¶47.    Therefore, this issue is without merit.

### 5.    Preparation of Penalty Phase Witnesses.

¶48.    Branch next assets that trial counsel failed to prepare his father, Willie Branch, for testifying during the penalty phase and that counsel refused to permit his mother, Ernestine Branch, to tell the jury that her

22

son was innocent. In support of these claims, Branch submits affidavits from his mother and father. Branch contends that counsel had a duty to adduce testimony in support of mitigating factors. *Collier v. Turpin*, 177 F.3d 1184, 1201-03 (11th Cir. 1999); *Bean v. Calderon*, 163 F.3d 1073, 1080-81 (9th Cir. 1998). Branch additionally asserts that trial counsel was deficient because they failed to develop penalty-phase testimony. *Wade v. Calderon*, 29 F.3d 1312, 1323 (9th Cir. 1994); *see generally Lockett v. Anderson*, 230 F.3d 695, 711-12 (5th Cir. 2000).

¶49. Through the penalty-phase testimony of Willie Branch, counsel was able to introduce evidence of Branch's childhood and adolescent life, his activities and interests, as well as Branch's involvement in his family, neighborhood, and community. Evidence of the statutory mitigating factors were discussed including no significant history of prior criminal history and Branch's age. Even the victim's husband's testimony was intended to persuade the jury that life imprisonment would be a more appropriate sentence. On the other hand, it would certainly not be sound trial strategy to place a witness on the stand to tell the jury that the decision they just reached in the guilt phase was wrong, which is exactly what Branch's mother's affidavit indicates that she would have said on the stand. Therefore, this issue is without merit.

### 6. Performance at Charge Conference.

¶50. Branch next claims that counsel was ineffective in that there were no penalty jury instructions regarding mental retardation and no objection to the State's sentencing instruction concerning the mitigating factors. Branch contends that in addition to the three mitigating factors mentioned (no significant criminal history, age, and "catch all"), that counsel should have submitted the following factors under Miss. Code Ann. § 99-19-101(6):

23

（b）The offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

（d）The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor.

（e）The defendant acted under extreme duress or under the substantial domination of another person.

（f）The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

¶51.    The evidence presented at trial and on this appeal do not warrant including these factors in the jury instructions.  There was no presentation of evidence showing that Branch was under the influence of extreme mental or emotional disturbance.  As to the accomplice factor, the testimony showed that Johnson was the one who brought the stick and attacked Ms. Jorden first.  However, Branch's own statement to the police indicated that he played an active role by striking Ms. Jordan three of the six times and that he held Ms. Jorden down while she was searched.  There has been no showing of extreme distress or domination either at trial or in the post-trial filings.  Finally, as to Branch's capacity, Dr. Lott's report indicates that "Branch was not suffering from a severe defect of reason due to a mental disorder at the time of the alleged offenses, and therefore, he had the ability to understand the nature and quality of his alleged acts and to understand the difference between right and wrong at the time."   Nor has there been any showing post-trial of any of these factors.

¶52.    Therefore, this issue is without merit.

### 7.    Additional Deficiencies/Cumulative Error

¶53.    We note in today's case that each of the foregoing assignments of error have been found to be without merit and we thus find that there was no cumulative error.  *Byrom v. State*, 863 So.2d 836, 847 (Miss. 2003); *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

24

**B. Guilt Phase.**

¶54. During the guilt phase, Branch contends that he received ineffective assistance of counsel by his counsel's: 1) failure to raise a *Batson* claim; 2) failure to present mental retardation evidence at the suppression hearing and at trial; 3) failure to defend against the DNA and blood evidence found on Johnson's clothes; 4) failure of Ms. Crawford to withdraw after becoming an authenticating witness. Each sub-issue will be discussed separately.

### 1. *Batson*

¶55. In order to prevail on an ineffective assistance of counsel claim based upon ***Batson v. Kentucky***, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), Branch would first have to prove that there exists a valid ***Batson*** claim. Procedurally, the first time one of Branch's trial attorneys raised a ***Batson*** claim was at the hearing on the Motion for New Trial; this claim was not raised in the motion itself.

¶56. An unusual situation arose in this particular instance. Apparently, there was mis-communication between the two defense attorneys. Ms. Crawford, who did not participate in the selection of the jury, orally raised the ***Batson*** challenge for the first time during the hearing. Immediately and before the State could respond, Mr. Stuckey "felt compelled to respond," perhaps in an effort to maintain his credibility with the trial court, and stated that he thought "the State had justifiable reasons to have them excused." He then went on to explain the justifiable reasons. Caught off guard, the State responded that "we looked at all the jurors that we struck very carefully." The trial court found that the issue was waived for failure to raise an objection at trial and that, based upon Mr. Stuckey's statements, there was no ***Batson*** issue. The State had no opportunity to give race-neutral reasons for its strikes.

25

¶57. Branch contends that a defendant may waive his rights but not agree to violate equal protection rights of venire. Branch relies on **Mata v. Johnson**, 99 F.3d 1261, 1268-69 (5th Cir. 1996), *vacated on other grounds*, 105 F.3d 209 (5th Cir. 1997) (cited within **Watts v. State**, 733 So.2d 214, 230 (¶ 48) (Miss. 1999)) and **United States v. Huey**, 76 F.3d 638, 639-40 (5th Cir. 1996). In **Mata**, the Fifth Circuit stated:

> **Batson** was designed not only to protect individual defendants from discrimination in the selection of jurors, but also to protect the rights of potential jurors and to ensure continued public confidence in the judicial system. In **Powers** and **McCollum**, the Court noticeably shifted the focus further away from the injury to the litigants and toward the more expansive harm done to the excluded jurors and the community at large.

**Mata**, 99 F.3d at 1269. Branch contends that "insofar as **Watts v. State**, 733 So.2d 214 (Miss. 1999) holds to the contrary, that disposition is wrongly decided as a matter of federal constitutional law."

¶58. Because Branch's counsel failed to raise the **Batson** claim during the course of the trial, we find that Branch is procedurally barred from raising this claim on appeal. Notwithstanding any procedural bar, this issue is without merit. In order to prevail on this claim, Branch must show:

> Under **Batson**, a defendant must show that (1) he is a member of a cognizable racial group; (2) that the prosecutor exercised peremptory challenges to excuse a venire person of the defendant's race; and (3) that there is an inference that the venire persons were excluded on account of their race.

**Thomas v. State**, 818 So.2d 335, 342 (¶ 15) (Miss. 2002) (citing **Collins v. State**, 691 So.2d 918, 926 (Miss. 1997). Once the challenging party makes a prima facie case of race or gender discrimination, the party setting forth the challenge must provide a neutral explanation for such challenge. At that point, the trial court has a duty to make an on-the-record factual determination of the validity of the **Batson** challenge. **Robinson v. State**, 761 So.2d 209, 210 (Miss. 2000). "The mere fact that a jury is white

26

does not violate *Batson*; rather it is the racially discriminatory exercise of peremptory challenges to strike jurors from the jury that violates the *Batson* rule." *Robinson v. State*, 761 So.2d 209, 211 (¶ 6) (Miss. 2000) (citing *Suddeth [Sudduth] v. State*, 562 So.2d 67, 71 (Miss. 1990)).

¶59.    Branch has failed to make a prima facie case showing of discrimination. The State used four peremptory challenges during jury selection. Branch has made no prima facie case that the strikes were based upon an impermissible reason, such as race or gender. Even though Ms. Crawford generally raised the issue, she made no specific challenge. Thereafter, co-counsel expressed that he felt that there were legitimate reasons for the State's four peremptory challenges. The only challenge argued in this appeal is directed to the State's second challenge of a black female, Juror No. 20, Ms. Natasha Woods Given. Mr. Stuckey responded that Ms. Given "was unresponsive to any death question at all, and I felt that was a legitimate reason." Branch argues that this reason "is insufficient as a matter of law as non-responsiveness if [sic] not, in itself, 'race neutral' and cites: *Williams v. State*, 669 N.E.2d 1372, 1381 (Ind. 1996); *see People v. Turner*, 42 Cal.3d 711, 727, 726 P.2d 102, 111-12, 230 Cal. Rptr. 656, 665-66 (1986); *Davis v. State*, 796 S.W.2d 813, 819 (Tex. Ct. App. 1990); *C.E.J. v. State*, 788 S.W.2d 849, 857 (Tex. Ct. App. 1990); *Daniels v. State*, 768 S.W.2d 314, 317-18 (Tex. Ct. App. 1988); *see also Hatten v. State*, 628 So.2d 294, 309-10 (Miss. 1993) (Banks, J., dissenting)(where mere demeanor is determined to be race-neutral under *Batson*, a record of the demeanor must be made). *See generally People v. Harris*, 544 N.E.2d 357, 380 (Ill. 1989)." However, this Court has found that "unresponsive" to questioning is a race-neutral reason. *Minor v. State*,  831 So.2d 1116, 1122 (¶ 17) (Miss. 2002).

27

¶60.    Branch further argues that he was not asked if he consented to the selection of the jury. In his post-trial affidavit, he now testifies that he would have liked to have blacks on his jury. While Branch again urges this Court to overrule *Watts,* arguing that the case was decided contrary to federal constitutional law; however, in the event this Court decides not to reverse itself, Branch advocates that this Court find that counsel was ineffective by their failure to raise the *Batson* challenge on behalf of Ms. Givens and then by giving reasons for the State's challenges. In doing so, Branch asserts that his counsel breached their duty to defend him and that courts are to presume prejudice where the defense counsel breaches the duty of loyalty to his client. *Hurlburt v. State*, 803 So.2d 1277, 1280 (¶ 10) (Miss. Ct. App. 2002); *Perillo v. Johnson*, 79 F.3d 441, 448 (5th Cir. 1996); *see Vielee v. State*, 653 So.2d 920, 921-22 (Miss. 1995).

¶61.    In rebuttal, the State relies on *Wardley v. State*, 760 So.2d 774, 778 (¶ 16) (Miss. Ct. App. 1999), which held that counsel's waiver of *Batson* was proper despite the fact that defendant was unaware of the decision and did not participate in making the decision. Further the State argues that there has been no showing that any of the State's strikes were improper or that counsel's reasons for conceding that there was no *Batson* claim was inappropriate. This Court agrees. Branch has failed to meet his burden of showing a prima facie case that the prosecutor exercised his peremptory strike against Ms. Givens on the basis of race or gender. Therefore, counsel cannot be faulted for failing to raise a *Batson* objection at the time. Failure to raise a meritless objection is not ineffective lawyering. *Brown v. State*, 798 So.2d 481, 494 (¶15) (Miss. 2001) (citing *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)). This issue is without merit.

28

## 2. Evidence of Mental Retardation at Suppression Hearing and at Trial.

¶62. Branch next argues that he received ineffective assistance of counsel during the hearing on the motion to suppress and at trial. Branch contends that at the suppression hearing, counsel made no mention of Branch's mental retardation, presented no theory of suppression, failed to argue that Branch's statement was the fruit of an unlawful seizure, and then, after Branch's counsel were unsuccessful in suppressing the statement, his trial counsel should have emphasized the points of the statement that were exculpatory.

¶63. Branch's argument on appeal is that his counsel presented no facts or theory of suppression at the hearing on his motion. First, there was no mention of the 1985 diagnosis of "mild mental retardation." If counsel had the 1985 diagnosis at their disposal, Branch asserts, they should have used this diagnosis to support the argument that the statement was not voluntary. The evaluation by Dr. Lott would not have been available to refute this diagnosis since the hearing was held February 13, 2002, and Dr. Lott's report is dated March 10, 2002. The videotaped confession, Branch contends, is the only evidence that links Branch with Johnson on the evening of the murder. Branch also contends that trial counsel was deficient in that they should have argued that the statement was the result of an unlawful seizure under Fourth Amendment and state constitutional grounds.

¶64. The suppression motion filed by trial counsel is eight pages long and the motion contains assertions that Branch was not advised of his constitutional rights; that he asserted his right to remain silent and to have counsel present, but was refused; that the confession was involuntary as a result of physical and psychological coercion; and that the confession was a result of a prior illegal confession. The hearing was held on February 13, 2002 at which time the court also heard Branch's motions to suppress DNA, for

29

psychiatric evaluation, and to suppress the confession. During the motion for psychiatric examination, Branch's mother testified and Branch's entire school transcripts were introduced as evidence. Mrs. Branch testified that Branch was treated at Life Help and that it was her opinion that Branch still suffers from the same thing today. At the conclusion of the psychiatric portion of the hearing, Judge Morgan indicated that the order on the psychiatric evaluation would "let them evaluate him all the way, . . . as to *M'Naughten* and as to litigation and as to any mental disease that he might be suffering from."

¶65.   The Court then went on to address the motion to suppress the confession. After Carroll County Deputy Sheriff Michael Spellman testified regarding the events of January 23, 2001, the State rested. The defense then called Branch. Branch testified that he was coerced into giving the statement. Branch explained that Sheriff Gray came to his home and requested that he accompany them to the police statement for questioning. Although he informed the officers that he had to go to work, the officers assured him that he would be back in time. Upon arrival at the station, he was fingerprinted. Branch talked to them and then was returned to his home so he could go to work.

¶66.   Branch then testified as follows: Deputies Spellman and "Pop" Miskelly came and picked him up from work. Cuffs were placed on him before he was put in the car. Before the car was started, Spellman started asking questions about the case and said that things do not add up. This time, Spellman said that Johnson told the officers that the two went to Trick Daddy's on the evening of Ms. Jorden's death. Branch explained that they never found Trick Daddy's so there was no need to tell the officers about it. At that point, Spellman started swearing and showed his pistol in the rearview mirror. Spellman then asked Branch if he knew about the house the recently burnt down with a child inside. Branch testified that Spellman said "you don't want nothing happening to that pretty house of yours, do you?" Branch believed the officer was

30

threatening his parents' home. Branch then testified that when they arrived at the station, he just repeated everything that he was told to say.

¶67.    Thus, through Branch's testimony, the defense advanced the theory that Branch's confession was not voluntary but rather coerced through physical and psychological intimidation by Deputy Spellman. Trial counsel also argued that the inculpatory statement   was Branch merely repeating everything Deputy Spellman told him to say.  However, as the State points out, during the statement, Branch indicates that Ms. Jorden was struck six times (three by Branch and three by Johnson) which is a fact later confirmed by the medical examiner and something that the police could not have known at the time of the investigation. During the suppression hearing, Judge Morgan was present and was able to judge the credibility of the witnesses presented, after which he found that there were no grounds to suppress the statement.

¶68.    Branch further contends on appeal that competent counsel would have directed the jury's attention to the exculpatory portions of Branch's statement during the trial, thus negating intent at the guilt phase and deliberateness at the penalty phase. *Moore v. Johnson*, 194 F.3d 586, 609-11 (5th Cir. 1999); *see Williams v. Taylor*, 529 U.S. at 398.  However, throughout the trial, the defense asserted the theory that not only was Johnson the person responsible for the murder, but that the crime was committed at a time when Branch was not present.  In closing, trial counsel argued that Johnson's clothes had Jorden's blood on them, that Johnson had Jorden's gun, that the crime was Johnson's idea, and that Johnson had the murder weapon.  As the State says, "Counsel used good parts of Appellant's bad statement."

¶69.    The foregoing assignment of error is without merit.

### 3.    Evidence of the victim's blood on Johnson's clothes.

31

¶70.    Branch next contends that trial counsel was *Strickland* deficient in that they failed to challenge the admission of Johnson's clothing as evidence against Branch. The only evidence, Branch asserts, that the State had connecting Branch to the clothing worn by Johnson was the statement given by Branch, therefore, counsel should have challenged the DNA testimony. During the trial, counsel did not cross-examine the State's experts Amy Winters, Joe Andrews or Chris Larsen; nor did counsel ever make a request for a DNA expert. Under *Richardson v. State*, 767 So.2d 195, 199 (Miss. 2000), an indigent defendant has a right to receive state funds for a DNA expert where the state presents DNA evidence, however, trial counsel made no effort to secure a DNA expert.

¶71.    The trial court ruled that Branch's statement was voluntary and non-coerced and that this statement linked Branch to Johnson and his blood stained clothing. In the statement, Branch confessed to his own involvement in the robbery and killing. As to the cross-examinations of the expert witnesses, Winters only testified to the standard process by which blood samples are taken and that these procedures were followed in collecting Ms. Jorden's blood. This was not an issue. Larsen testified that DNA evidence indicated that the blood found on Johnson's clothing was Ms. Jorden's blood and further that there was no evidence linking Branch to Ms. Jorden's murder. Again, this was not an issue given the strategy that Johnson killed Ms. Jorden but not while Branch was with him. The only testimony given by Andrews was confirming that the two pieces of wood found previously constituted one piece and that both pieces were consistent with other wood found at Johnson's home. Trial counsel's objection to the introduction of this evidence was overruled. None of the evidence to which the State's expert witnesses testified, including the DNA and blood, Johnson's clothing, or the wood, directly linked Branch to Ms. Jorden's murder. Thus,

32

there was no need for a DNA expert. ***Richardson v. State***, 767 So.2d at 198; ***Coleman v. State***, 697 So.2d 777, 782 (Miss. 1997) (citing ***Davis v. State***, 374 So.2d 1293, 1297 (Miss. 1979)).

¶72.	Throughout the trial, trial counsel did not dispute that Johnson killed Jorden. However, the defense asserted throughout the trial was that Branch was not with Johnson at the time the killings took place. Thus, this issue is without merit.

### 4.	Crawford as an authentication witnesses.

¶73.	Branch next contends that his attorney, Ms. Crawford should have withdrawn because she became an authenticating witness for the evidence brought by Willie Branch to the sheriff's office. This evidence was admitted and authenticated by Deputy Spellman and Sheriff Gray. The evidence consisted of a white plastic bag found by Willie Branch in the Johnson's yard. The bag contained Ms. Jorden's gun, money, food stamps, and coin wrappers. The sheriff testified that several nights after Johnson and Branch were arrested, that he received a telephone call at his home from defense counsel Crawford and Osborne indicating that they need to relay some information. At the scheduled meeting the next morning, Willie Branch, accompanied by Crawford and Osborne, presented the white plastic bag. Due to counsel's involvement, Branch asserts, defense could not raise an objection to the admission of the evidence and, in fact, united the state's evidence. Branch relies on Miss. R. Prof. Conduct, Rule 3.7(a)(1), ***Pearson v. Parsons***, 541 So.2d 447, 452 (Miss. 1989), ***State ex rel. Karr v. McCarty***, 187 W.Va. 201, 203-204, 417 S.E.2d 120 (1992). Branch argues that this matter was further complicated by the fact that Ms. Crawford was the person who conducted the cross-examination of the two State's witnesses.

¶74. *Simmons v. State*, 805 So.2d 452, 488-89 (Miss. 2001), was an interlocutory appeal concerning the issue of whether a videotape provided by defense counsel could be introduced as evidence against the defendant. The video was made by defendant displaying his involvement with a murder and was provided to defense counsel by defendant's wife. *Simmons* did not directly address the question of whether his counsel had to be excused after producing the tape. However, the defense counsel is not prohibited from challenging authentication of evidence produced by the defense in the course of reciprocal discovery.

¶75. Rule 3.7(a) of the Mississippi Rules of Professional Conduct states that "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where: (1) the testimony relates to an uncontested issue." There was no need to challenge the authentication of the bag and its contents. Since the bag was found in Johnson's yard, the evidence only served to reinforce the defense's theory that Johnson killed Ms. Jorden.

¶76. This issue is without merit.

## C. Prejudice

¶77. *Strickland*'s second prong requires a showing that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In light of the discussion of the foregoing issues, each of the sub-issues were found to be without merit.

## III. *Caldwell v. Mississippi.*

34

¶78. Branch next seeks to set aside the imposition of the death penalty in that his own counsel diminished the jury's sense of responsibility in making the sentencing decision. During the summation at the penalty phase, Branch's own counsel made inflammatory remarks, including: 1) a reference to putting sick animal to sleep, 2) that a life sentence is no different from death, and 3) that an individual sentenced to death will not die for years to come. In challenging the first statement, Branch relies on *Caldwell v. Mississippi*, 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); *Antwine v. Delo*, 54 F.3d 1357 (8th Cir. 1995); *Hill v. State*, 432 So.2d 427, 439 (Miss. 1983); *Edwards v. State*, 737 So.2d 275, 315 (Miss. 1999). As to the second statement, Branch asserts that counsel's remark that the life sentence is not different from death raises three problems: that it is legally erroneous, *Caldwell*, 472 U.S. at 329, that it is false, *McGautha v. California*, 402 U.S. 183, 208, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), and that the remarks were made by Branch's own advocate, *Berry v. State*, 345 So.2d 613, 615 (Miss. 1977); *Singleton v. Stegall*, 580 So.2d 1242, 1244-45 (Miss. 1991); *Thornton v. Breland*, 441 So.2d 1348, 1350 (Miss. 1983). As to the third statement, Branch asserts that his counsel violated *Caldwell* in suggesting that individuals sentenced to die will not be executed for years to come. *Caldwell*, 472 U.S. at 325, *Commonwealth v. Baker*, 511 A.2d 777, 787-90 (Pa. 1986). As to such errors, Branch asks the rhetorical question of who can raise a challenge to such remarks when they are made by his own counsel.

¶79. Granted, a trial counsel is afforded great latitude in closing arguments. *Johnson v. State*, 416 So.2d 383, 391-92 (Miss. 1982) (citing *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 382, 131 So. 817, 820 (1930). That latitude "contemplates liberal freedom of speech and range of discussion confined

only to bounds of logic and reason; and if counsel's argument is with the limits of proper debate, it is immaterial whether it is sound or unsound or whether he employs wit, invective, and illustration therein." *Evans v. State*, 725 So.2d 613, 676 (Miss. 1997) (citing *Monk v. State*, 532 So.2d 592, 601 (Miss. 1988)). However, such remarks made by prosecutors risk reversal. *Berger v. United States*, 295 U.S. 78, 88 (1935).

¶80. While prosecutors may not make such remarks, remarks made by the defense counsel will be perceived more favorably because the jury recognizes that counsel and the defendant are working toward the same goal, to avoid the death sentence. The gist of trial counsel's argument was that if the jury really wanted to punish Branch, they should sentence him to life imprisonment, not death.

¶81. As to the statement regarding the difference between the life and death sentences, we agree that this statement was legally erroneous. However, we find this error to be harmless. After the jury had already found Branch guilty of capital murder, defense counsel's sole objective was to convince the jury to impose a life sentence rather than death. The nine points bought out by counsel during summation were made in an attempt to achieve that goal. At no point did the defense counsel impermissibly lead the jury to believe that the responsibility for determining the appropriateness of defendant's death lay anywhere other than in the jury. Therefore, there is no violation under *Caldwell*, and this issue is without merit.

**IV.    Deficient performance of counsel under the Eighth Amendment.**

¶82. Branch next asserts that the Eighth Amendment requires that his death sentence be vacated. In doing so, Branch reiterates the allegations made in the *Strickland* argument above, but advances the argument that the Eighth Amendment requires a higher standard of effective assistance of counsel than that

36

provided by the Sixth Amendment. Branch also asserts that a defendant must not have the burden of protecting himself from Eighth Amendment violations by his own attorney. Branch makes numerous citations to case law and law review articles.

¶83. We have held that:

> On appeal to this Court, convictions upon indictments for capital murder and sentences of death must be subjected to "heightened scrutiny." *Balfour v. State*, 598 So.2d 731, 739 (Miss. 1992) (citing *Smith v. State*, 499 So.2d 750, 756 (Miss. 1986); *West v. State*, 485 So.2d 681, 685 (Miss. 1985)). Under this method of review, all doubts are to be resolved in favor of the accused because "what may be harmless error in a case with less at stake becomes reversible error when the penalty is death." *Id.* (quoting *Irving v. State*, 361 So.2d 1360, 1363 (Miss. 1978)). See also *Fisher v. State*, 481 So.2d 203, 211 (Miss. 1985).

*Byrom v. State*, 863 So.2d 836, 846 (¶ 9) (Miss. 2003). This Court utilizes the two-prong approach under *Strickland* when evaluating ineffective assistance of counsel claims, even in death penalty cases. *Foster v. State*, 687 So.2d 1124, 1141 (Miss. 1996). Neither this Court, the Fifth Circuit, nor the Supreme Court have ever recognized the "super due process" test advanced by Branch. Any argument concerning ineffective assistance of counsel, without having to prove prejudice, must be made under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), which is Branch's next assignment of error.

¶84. Therefore, this issue is without merit.

### V. *United States v. Cronic.*

¶85. Branch next argues that he was provided ineffective assistance of counsel at the penalty phase under *United States v. Cronic*, 466 U.S. at 657-58. Counsel contends that unlike an ineffective assistance of counsel claim under *Strickland*, an attorney found ineffective under *Cronic* prosecuted his

37

own client. Branch again reiterates his previous arguments that he was provided ineffective assistance of

counsel through the lack of investigation and preparation, absence of strategy, and multiple *Caldwell*

errors. Branch acknowledges that successful claims under *Cronic* will be rare. *Freeman v. Graves*,

317 F.3d 898 (8th Cir. 2003), *Hunter v. Moore*, 304 F.3d 1066, 1070 n.4 (11th Cir. 2002), *Haynes*

*v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002), *see generally* *Toomey v. Bunnell*, 898 F.2d 741, 744

n.2 (9th Cir. 1990).

> The Supreme Court has recognized a limited exception to the prejudice requirement when (1) assistance of counsel has been denied completely, (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," or (3) counsel is denied during a critical stage of the proceedings. *Cronic*, 466 U.S. at 658-59, 104 S.Ct. 2039; see *Mickens v. Taylor*, 535 U.S. 162, 122 S.Ct. 1237, 1240-41, 152 L.Ed.2d 291 (2002).

*Freeman v. Graves*, 317 F.3d at 900. In this case, because the errors were committed by his own

counsel, Branch argues that there was no meaningful adversarial testing of prosecutor's case. *Bell v.*

*Cone*, 535 U.S. 685, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002) (discussing egregious trial conduct

necessary to remove a case from *Strickland* analysis and apply a *Cronic* analysis).

> When applying *Strickland* or *Cronic*, the distinction between counsel's failure to oppose the prosecution entirely and the failure of counsel to do so at specific points during the trial is a "difference ... not of degree but of kind." [*Bell*, 122 S.Ct. at 1851 (quoting *Cronic*, 466 U.S. at 659, 104 S.Ct. 2039) ]. Under this rationale, when counsel fails to oppose the prosecution's case at specific points or concedes certain elements of a case to focus on others, he has made a tactical decision. *Id.* at 1851-52. By making such choices, defense counsel has not abandoned his or her client by entirely failing to challenge the prosecution's case. Such strategic decisions do not result in an abandonment of counsel, as when an attorney completely fails to challenge the prosecution's case. Under the Court's reasoning, then, *Cronic* is reserved only for those extreme cases in which counsel fails to present any defense. We presume prejudice in such cases because it is as if the defendant had no representation at all. In contrast, strategic or tactical decisions are evaluated under *Strickland*'s traditional two-pronged test for deficiency and prejudice.

*Haynes v. Cain*, 298 F.3d 375, 381 (5th Cir. 2002).

¶86.    A defendant is not entitled to errorless counsel. *Hansen v. State*, 649 So.2d 1256, 1259 (Miss. 1994), *Johnson v. State*, 511 So.2d 1333, 1339-40 (Miss. 1987). This Court must look to the entire performance of counsel to determine whether he or she was competent and conscientiously fulfilled the role as advocate.  In studying the record before us, we find that Branch was represented by competent and zealous counsel.  Trial counsel challenged the State's evidence at all stages of this case by filing and arguing numerous pre-trial motions, throughout the trial itself, throughout the sentencing hearing, and through post-trial motions.  Therefore, this issue is without merit.

## VI.    Miss. Code Ann. § 99-19-105.

¶87.    Branch next asserts that the sentence imposed was arbitrary, excessive, and disproportionate. Branch relies on the following cases: *Reddix v. State*, 547 So.2d 792, 794 (Miss. 1989); *Smith v. State*, 729 So.2d 1191, 1220 (Miss. 1998);*Leatherwood v. State*, 435 So.2d 645, 656 (Miss. 1983); *Stringer v. State*, 454 So.2d 468, 479 (Miss. 1984); *Jordan v. State*, 728 So.2d 1088, 1100 (Miss. 1998); *Conner v. State*, 632 So.2d 1239, 1264-65 (Miss. 1993);*Bullock v. State*, 525 So.2d 764, 768 (Miss. 1987); and *Wilcher v. State*, 697 So.2d 1087, 1113 (Miss. 1997).

¶88.    This Court is required to review the death sentence in accordance with Miss. Code Ann. § 99-19-105(3), which states:

> (3)    With regard to the sentence, the court shall determine:
>
> (a)    Whether the sentence of death was imposed under the influence
>           of passion, prejudice or any other arbitrary factor;

(b)     Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in Section 99-19-101;

(c)     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant; and

(d)     Should one or more of the aggravating circumstances be found invalid on appeal, the Mississippi Supreme Court shall determine whether the remaining aggravating circumstances are outweighed by the mitigating circumstances or whether the inclusion of any invalid circumstance was harmless error, or both.

¶89.     There is no evidence supporting a finding that the sentence imposed was a result of passion, prejudice, or any arbitrary factor. The evidence supports the jury's finding of the statutory aggravator that the crime was committed for pecuniary gain in that in his statement Branch admitted holding Jorden down while he took money from her pocket. Although Branch attempts to discredit his own statement, based upon a review of the evidence, "it was reasonable for the jury to disregard as implausible" Branch's claim of a police set-set as it relates to his confession. *Jordan v. State*, 786 So.2d 987, 1030 (Miss. 2001).

¶90.     Nor is this sentence excessive or disproportionate when comparing the facts and circumstances of the case with those of other cases. See Appendix. We acknowledge that the death penalty has been upheld in capital murder cases involving the commission of a robbery, *Doss v. State*, 709 So.2d 369 (Miss. 1997); *Cabello v. State*, 471 So.2d 332 (Miss. 1985); *Evans v. State*, 422 So.2d 737 (Miss. 1982); capital murder committed at victim's home, *Knox v. State*, 805 So.2d 527, 534 (Miss. 2002), *Manning v. State*, 765 So.2d 516 (Miss. 2000), *Ballenger v. State*, 667 So.2d 1242, 1268 (Miss. 1995), *Mack v. State*, 650 So.2d 1289, 1331-32 (Miss. 1994), *Chase v. State*, 645 So.2d 829, 861-62 (Miss. 1994); and where defendant had little or no criminal history, *Davis v. State*, 684 So.2d 643

40

(Miss. 1996), *Foster v. State*, 639 So.2d 1263 (Miss. 1994). Having considered the facts of this case and having reviewed the foregoing cases as well as those listed in the Appendix, we find that the death sentence was not excessive or disproportionate notwithstanding the fact that Branch's co-defendant, Deondray Johnson, received a life sentence. The evidence of the crime adduced during trial, including his own videotaped confession, indicates that Branch was actively involved in the bludgeoning of the female victim while robbing her.

¶91.    Therefore, this issue is without merit.

### VII.    *Batson v. Kentucky.*

¶92.    As the seventh assignment of error, Branch asserts that his Sixth and Fourteenth Amendment rights and those rights of one venire member were violated under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). For the reasons set forth in Section II(B)(1), we find no violation under *Batson*.

### VIII.    Victim impact testimony.

¶93.    Branch next asserts that the trial court erred when it permitted the testimony of the victim's sister, Frankie Rogers. The defense raised a relevancy objection, to which the State responded with a citation to the Victim Impact Statement Act, Miss. Code Ann. § 99-43-1, et seq. Defense rebutted that the Act was not applicable to capital sentencing. The trial court overruled the objection and based its ruling on the Victim Impact Statement Act and *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

¶94.	Branch asserts two arguments: 1) victim impact testimony is only admissible in Mississippi if the testimony supports an aggravating factor and 2) victim impact testimony should be prohibited because the testimony may contribute impermissibly to the imposition of death in violation of the statutory scheme and undermine the reliability of the sentencing determination.  Branch argues that while *Payne* does not establish a per se bar to victim impact testimony, this Court has held that victim impact testimony is constitutionally permissible, but not mandatory, and should only be used in narrow circumstances. *Hansen v. State*, 592 So.2d 114, 146 (Miss. 1991). In *Payne*, the Supreme Court ruled that state legislatures may determine the instances where victim impact testimony is relevant. *Payne*, 501 U.S. at 827.  Branch's argument continues that since the State only relied on one aggravating factor which was proven during the guilt phase, the victim impact testimony was not necessary and was used to incite jury.

¶95.	Branch's reliance on *Randall v. State*, 806 So.2d 185, 218 (Miss. 2001), is misplaced.  In *Randall*, this Court was addressing the admissibility of the defendant's "pen pack," which is a package from the penitentiary indicating tattoos, known gang affiliations, or other group affiliations.  We found the "pen packs" were admissible only if relevant. 806 So.2d at 219.

¶96.	Victim impact testimony has been found to be admissible at sentencing under *Payne*, 501 U.S. at 825; *United States v. Bernard*, 299 F.3d 467, 480-81 (5th Cir. 2002); *Jordan v. State*, 786 So.2d 987, 1016 (Miss. 2001); *Wilcher v. State*, 697 So.2d 1123, 1134 (Miss. 1997); *Wilcher v. State*, 697 So.2d 1087, 1104 (Miss. 1997); *Hansen v. State,* 592 So.2d at 146. Our Legislature has provided that with the permission of the courts, an oral victim impact statement may be used at any sentencing hearing.  Miss. Code Ann. § 99-19-157(2):

42

If a court does not order the preparation of a presentence evaluation report on a defendant in a felony case, the victim or victim representative may also submit a victim impact statement in one or both of the following ways:

> (a)      With the permission of the trial court, the victim may present an oral victim impact statement at any sentencing hearing. However, where there are multiple victims, the court may limit the number of oral victim impact statements.

We have found victim impact testimony appropriate in several cases:

> Victim impact evidence, if relevant, is admissible in the sentencing stage. *Davis v. State*, 684 So.2d 643, 661 (Miss. 1996) (citing *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Jenkins v. State*, 607 So.2d 1171, 1183 (Miss. 1992)). This Court has held that evidence about the characteristics of the victim is relevant to the crime charged: "The evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury." *Jenkins*, 607 So.2d at 1183 (evidence that victim was a mother, that she was a wife of four years, that she was shy and did not like to wear dresses because they exposed her legs was relevant). . . .. Furthermore, the United States Supreme Court has acknowledged that a State "may legitimately conclude that evidence about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne*, 501 U.S. at 827, 111 S.Ct. at 2609.

*Wilcher v. State,* 697 So.2d at 1104.

¶97.    The challenged testimony was made by the victim's sister, Frankie Rogers. Rogers only testified as to Jorden's role in her family and the community; that Ms. Jorden moved from Memphis to Carroll County to help her daughter raise her granddaughter in the country, and how Rogers has now had to assume Jorden's role as head of the family. Here, "[t]he evidence offered was proper and necessary to a development of the case and true characteristics of the victim and could not serve in any way to incite the jury." *Crawford v. State,* 716 So.2d 1028, 1046-47 (Miss. 1998), *overruled on other grounds* (citing *Jenkins v. State*, 607 So.2d 1171, 1183 (Miss. 1992)).

¶98.    Therefore, this issue is without merit.

### IX.    Defense Sentencing Instructions DS-1, DS-5, and DS-10.

¶99.    Branch next asserts that the trial court erred in its refusal of three instructions offered by defense and that this error was not cured by giving defense latitude in the summation. The three instructions included: DS-5, covering the balancing of aggravating and mitigating circumstances; DS-1, arguing sufficiency of the aggravating circumstances to warrant death; and DS-10, regarding the jury's complete discretion in the ultimate determination of the sentence. The trial court found that each of these instructions were covered by instructions already given by the court.

¶100.   This Court's standard of review of jury instructions is as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case, however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Humphrey v. State*, 759 So.2d 368, 380 (Miss. 2000) (citing *Heidel v. State*, 587 So.2d 835, 842 (Miss. 1991)).

¶101.   <u>DS-5 and DS-1</u>:  The trial court gave as SS-1A "the standard, long-form sentencing instruction" informing the jury how to consider aggravating and mitigating circumstances under *Ladner v. State*, 584 So.2d 743, 760 (Miss. 1991).  This instruction, in part, states:

> Next to return the death penalty, you must find that the mitigating circumstances--those which tend to warrant the less severe penalty of life imprisonment without parole--do not outweigh the aggravating circumstances--which tends to warrant the death penalty.

> * * *

If you find from the evidence that one or more of the preceding elements of mitigation exists, then you must consider whether it (or they) outweigh(s) or overcome(s) the aggravating circumstance you previously found. In the event that you find that the mitigating circumstance(s) do not outweigh or overcome the aggravating circumstance, you may impose the death sentence. Should you find that the mitigating circumstance(s) outweigh or overcome the aggravating circumstance, you shall not impose the death sentence.

Also given was SS-4:

The Court instructs the jury that it must be emphasized that the procedure that you must follow is not a mere counting process of a certain number of aggravating circumstances versus the number of mitigating circumstances. Rather, you must apply your reasoned judgment as to whether this situation calls for life imprisonment without parole or whether it requires the imposition of death, in light of the totality of the circumstances present.

Defense counsel submitted the following instruction as DS-5, which states:

If the mitigating factors outweigh the aggravating factors, then you should return a verdict of life imprisonment without parole. Any mitigating circumstance, standing alone, may outweigh any aggravating circumstances and may be sufficient to support a decision that a life sentence without parole is the appropriate punishment.

The State objected on the ground that DS-5 was in conflict with the State's instruction SS-1A. At that time, Mr. Stuckey argued that SS-1A instructed jurors to impose death if they found beyond a reasonable doubt that the State proved an aggravating factor and that the instruction "does not say that even if an aggravating circumstance is still found, it still doesn't require the death penalty." Again, the trial court found that the instruction was covered by sentencing instructions 1 and 4 but that the defense counsel was free to argue his point on summation.

¶102.   Branch contends that since Mississippi requires jurors to weigh aggravating and mitigating circumstances, that DS-5 would inform the jury that any mitigating circumstance can outweigh one or more aggravating circumstances. *See **People v. Hayes***, 52 Cal.3d 577, 642, 276 Cal. Rptr. 874, 915, 802 P.2d 376, 417 (1990).  Branch argues that by failing to adequately instruct the jury, there is a violation of

the constitutional mandate for a reliable sentencing determination; *People v. McDowell*, 46 Cal. 3d 551, 576, 250 Cal. Rptr. 530, 544 (1988); *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976). Thus, the court impaired the jury's ability to give full effect to the mitigating circumstances. *Lockett v. Ohio*, 438 U.S. 586, 608, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

¶103. The instruction submitted by defense as DS-1 states as follows:

> The court instructed the jury that there is no requirement that you impose the death sentence when aggravating circumstances are shown and mitigating circumstances are not; proof of aggravating circumstances may still be found by you insufficient to require death. The State of Mississippi still carries the burden of showing not only aggravating circumstances, but that those circumstances are sufficient to warrant death.

The trial court found that under *Holland v. State*, 705 So.2d 307, 354 (Miss. 1997), the defendant is not entitled to such an instruction. The trial court also found that the instruction was covered by sentencing instructions 1 and 4 and that the defense counsel was free to argue his point on summation.

¶104. Branch argues that under Miss. Code Ann. § 99-19-101, the jurors are required to perform an additional step, which is to determine whether the aggravating circumstances are sufficient to warrant imposition of a death sentence. Branch argues that although SS-4 hints at this separate step, the instruction fails to inform the jury that aggravating factors may be insufficient to warrant death regardless of the weight or existence of mitigating circumstances. Branch further argues that the denial of this instruction undermined the reliability of the sentencing determination, lowered or eliminated the state's burden of proving the aggravating circumstance was sufficient to warrant death, and the absence of the sufficiency inquiry increased the likelihood that the jury would impose the death sentence.

¶105.   *Ladner v. State*, 584 So.2d at 760 effectively nullifies Branch's claims to DS-5 and DS-1 because SS-1A satisfies *Ladner.*  Additionally, the same type of instructions were denied in *Holland v. State*, 705 So.2d at 354 (finding that defendant is not entitled to instructions on sympathy and, therefore, has no due process claim).  This Court finds that the instructions provided by the trial court fairly and adequately stated the law and, therefore, this issue is without merit.

¶106.   <u>DS-10</u>: Defense counsel also offered the following instruction, DS-10:

> You may find that a sentence of death is inappropriate even if there is only a single mitigating circumstance and multiple aggravating circumstances.  You may also find that death is not warranted even though there are one or more aggravating circumstances and not a single mitigating circumstance.  You are not required to find any mitigating circumstances in order to return a sentence of life imprisonment without parole.  Nor does the finding of an aggravating circumstance require that you return a sentence of death.  You, as a juror, always have the option to sentence the Defendant, Lawrence Branch, to life imprisonment without parole.

The State objected to this "mercy instruction" and cited *Edwards v. State*, which according to Mr. Hill, stands for the proposition that: "A defendant is not entitled to an instructions where you do not have to find any mitigating circumstances in order to return a life sentence" and that "such instruction is a mercy instruction and results in a verdict based on whim or caprice."  The court went on saying that while the defense was not entitled to an instruction on jury nullification, that counsel was free to argue nullification.

¶107.   Branch argues that Mississippi juries always have the option to chose life over a death sentence, even where the statutory aggravating circumstances outweigh the mitigating circumstances. *Foster v. State*, 687 So.2d 1124, 1139 (Miss. 1996); *Leatherwood v. State*, 435 So.2d 645, 650 (Miss. 1983); *Thorson v. State*, 653 So.2d 876, 894 (Miss. 1994); *Coleman v. State*, 378 So.2d 640, 646 (Miss. 1979); *Evans v. Thigpen*, 631 F. Supp. 274, 287 (S.D. Miss. 1986), *aff'd*, 809 F.2d 239 (5th Cir.

47

1987); ***Gray v. Lucas***, 677 F.2d 1086, 1105 (5th Cir. 1982). This instruction is often referred to as a "life option" instruction and since SS-1A covered this instruction, no additional instructions were necessary. ***Edwards v. Thigpen***, 595 F. Supp. 1271 (S.D. Miss. 1984), *aff'd sub nom.*, ***Edwards v. Scroggy***, 849 F.2d 204 (5th Cir. 1988) [additional citations omitted] Further, this instruction was improper under the theory of jury nullification. ***Brengettcy v. State***, 794 So.2d 987, 999 (Miss. 2001) (citing ***Nicolaou v. State***, 612 So.2d 1080, 1084 (Miss. 1992)); ***Hansen v. State***, 592 So.2d 114, 140 (Miss. 1991).

¶108. This Court finds that the jury instructions given by the trial court were in accordance with Mississippi law and that the instructions fairly and adequately instructed the jury. Furthermore, the defense was not entitled to the rejected instructions. Therefore, this issue is without merit.

> **X. Trial court erred in refusing to give defense sentencing instructions DS-1 in that DS-1 advised the jury as to the burden of proof.**

¶109. Branch next argues that by failing to give jury instruction DS-1, the trial court erred in advising the jury as to the proper burden of proof that the aggravating circumstances are sufficient to warrant death. In part, this argument is already covered in Section IX, above. The trial court denied DS-1 and found this instruction redundant since the court was already advising the jury under SS-1A and SS-4. However, Branch contends that neither indicate to the jury which party has the burden of proof at the sentencing hearing and that the government bears the burden of proof of any aggravating circumstance. ***Walton v. Arizona***, 497 U.S. 639, 643-44, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled in part on*

*other grounds,* ***Ring v. Arizona*** , 536 U.S. 584, __, 122 S.Ct. 2428, 2432, 153 L.Ed.2d 556, 564 (2002).

¶110. SS-1A mirrors the capital sentencing statute and properly places the burden of proving the ***Enmund*** factors beyond a reasonable doubt on the State. ***Stringer v. State*** , 500 So.2d 928, 944 (Miss. 1986). Branch, however, argues that the charge implies the burden is proof beyond a reasonable doubt, but that the charge does not explicitly instruct who has that burden. Branch attempts to distinguish ***Blue v. State*** , 674 So.2d 1184, 1223-24 (Miss. 1996), *overruled on other grounds* , by arguing that "this is not a case where the instructions given made no mention of the burden of proof and the defendant failed to request an instruction as to the burden of proof."

¶111. Branch's distinction of ***Blue*** is not well-taken. The identical instruction was viewed in ***Blue*** , and the defendant argued that the instruction shifted the State's burden. In ***Blue*** , 674 So.2d at 1223-24, this Court pointed out that the same argument had previously been rejected in ***Conner v. State*** , 632 So.2d 1239, 1278 (Miss. 1993); ***Turner v. State*** , 573 So.2d 657, 668 (Miss. 1990); ***Shell v. State,*** 554 So.2d 887, 904 (Miss. 1989) *, rev'd on other grounds* , 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); ***Stringer v. State*** , 500 So.2d 928, 944 (Miss. 1986); ***Jordan v. State*** , 365 So.2d 1198 (Miss. 1978).

¶112. Therefore, this issue is without merit.

> **XI. Trial court erred in refusing to give defense sentencing instruction DS-2 in that DS-2 provided a constitutionally required definition of "mitigating circumstance."**

¶113. The next assignment asserted by Branch is that the jury was not given a definition of "mitigating circumstances" which is not a commonly understood principle or that it has a technical meaning particular to the law. Branch further asserts that Miss. Code Ann. § 99-19-101 does not define "mitigating circumstance." Without argument, Branch cites numerous cases for the proposition that the trial court erred by failing to provide a definition of certain legal terms. The challenged instruction reads as follows:

> Mitigating facts are facts that, while they do not justify or excuse the crime, must be considered by you as extenuating or reducing the degree of the Defendant's blame of punishment.

¶114. Although this issue was not raised at the trial court level, it is a "well- recognized rule of law that the refusal of an instruction is procedurally preserved for our review by the mere tendering of the instruction and an objection to its refusal is not necessary." *King v. State*, 857 So.2d 702, 727 n.9 (Miss. 2003) (citing *Duplantis v. State*, 708 So.2d 1327, 1339-40 (Miss. 1998)). However, this issue is without merit. This Court has already rejected the same argument in *Cole v. State*, 525 So.2d 365, 374-75 (Miss. 1987).

¶115. In *Cole*, "[w]e rejected this argument in *Booker v. State*, 449 So.2d 209, 218-19 (Miss. 1984), *vacated on other grounds*, 472 U.S. 1023, 105 S.Ct. 3493, 87 L.Ed.2d 626 (1985). We are of the opinion that the sentencing instruction given in the case at bar, which tracked the language of the statute, appropriately channeled the sentencer's discretion. *King v. State*, 421 So.2d 1009 (Miss. 1982), *cert. denied*, 461 U.S. 919, 103 S.Ct. 1903, 77 L.Ed.2d 290 (1983)." *Cole,* 525 So.2d at 375.

¶116. Branch attempts distinguish these cases in three aspects: 1) neither case determines that a defendant is not entitled to an instruction defining mitigating circumstances, but that the jury had already been

50

adequately instructed, 2) the challenged instructions were extremely different from the one offered in this case, and 3) neither case addressed an Eighth and Fourteenth Amendment concern. This Court disagrees. The instruction given in this case, SS-1A, which paralleled the language of Miss. Code Ann. § 99-19-101, sufficiently informed the jury as to mitigating circumstances. Branch raises the same arguments that this Court rejected in *Cole.* Therefore, this issue is without merit.

### XII. The State's burden of showing that death was the appropriate sentence.

¶117. Under this assignment of error, Branch argues that he was denied the due process guarantee that a life sentence is presumed over the death penalty because he was forced to prove himself ineligible for death, thereby shifting the burden from the State to Branch. In relying on *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Branch asserts that the reasonable doubt rule applies to facts increasing the range of punishment at sentencing, effectively requiring the State to prove that it is entitled to the penalty it seeks. By applying *Apprendi*, the United States Supreme Court held in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) that the aggravating circumstances are elements of the offense giving rise to the possibility of greater punishment, which must be proven beyond a reasonable doubt. *Ring*, 536 U.S. at ___, 122 S.Ct. at 2443, 153 L.Ed.2d at ___.

¶118. Branch argues that the sole aggravating factor relied upon by the prosecution was the same element used to elevate the crime to capital murder – murder committed during the commission of a robbery. Thus, he contends, the burden shifted to him to prove that he was not death worthy in violation of the Eighth Amendment. Not only is this issue procedurally barred for failing to raise this issue in the trial court, this issue is without merit.

51

¶119. Branch is not entitled to an instruction that life is the presumed sentence in that the sentencing instruction given in this case was sufficient. *Edwards v. State*, 737 So.2d 275, 317 (Miss. 1999); *Watts v. State*, 733 So.2d 214, 241 (Miss. 1999); *Jackson v. State*, 684 So.2d 1213, 1233 (Miss. 1996). In *Chase v. State*, 645 So.2d 829 (Miss. 1994), the defendant asserted that an instruction allowed by the trial court improperly shifted to the defense the burden of proving that mitigating circumstances outweighed aggravating circumstances, this Court flatly rejected the appellant's argument that "a defendant should go into the sentencing phase with a presumption that life is the appropriate punishment." *Chase*, 645 So.2d at 860. We reached the same result in *Edwards*. This is consistent with the legal effect of the conviction:

> Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears. *Cf. Ross v. Moffitt*, 417 U.S. 600, 610, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974) ("The purpose of the trial stage from the State's point of view is to convert a criminal defendant from a person presumed innocent to one found guilty beyond a reasonable doubt").

*Herrera v. Collins*, 506 U.S. 390, 399, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1933). Once the jury found Branch guilty of capital murder, under Miss. Code Ann. § 99-19-101, the available sentences are death or life imprisonment without parole.

¶120. Branch's reliance on *Apprendi* and *Ring* is misplaced. The statutory scheme of Arizona is significantly different than here in Mississippi. Under Arizona law, a defendant convicted of first degree murder could not be sentenced to the statutory maximum penalty of death unless the judge made further findings in a separate sentencing hearing. At that stage, the judge must determine if any statutorily enumerated "aggravating circumstances" and any "mitigating circumstances" exist. Only if the judge finds

at least one aggravating circumstance and no mitigating circumstances sufficient substantial to call for leniency, may the judge impose death. *See generally **Ring***, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In Mississippi, for a jury to impose death:

> it must unanimously find in writing the following: (a) That sufficient factors exist as enumerated in subsection (7) of this section; (b) That sufficient aggravating circumstances exist as enumerated in subsection (5) of this section; and (c) That there are insufficient mitigating circumstances, as enumerated in subsection (6), to outweigh the aggravating circumstances.

Miss. Code Ann. § 99-19-101(3).

¶121. The jury was properly instructed as to their duty in determining the sentence to be imposed. The aggravating circumstance, pecuniary gain, was proved beyond a reasonable doubt. The jury found that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and [] further find unanimously that the defendant should suffer death." Thus, Branch was not denied due process, and this issue is without merit.

### XIII. The aggravating circumstance of pecuniary gain.

¶122. In this assignment of error, Branch continues his argument that every person convicted in the State of Mississippi under Miss. Code Ann. § 97-3-19(2)(e), an offense carrying a maximum sentence of life imprisonment, shall suffer death because the jury reaffirms some of the same elements. Thus, Branch continues, that since his conviction under § 97-3-19(2)(e) makes him eligible for the death penalty, then the State relies on that conviction as proof of the aggravating factor of pecuniary gain. This statutory scheme fails to narrow the class of offenders eligible for the death penalty, according to Branch. Branch relies on ***Ring v. Arizona***, 536 U.S. 584 (2002); ***Evans v. State***, 725 So.2d 613 (Miss. 1998); ***West v. State***, 725 So.2d 872 (Miss. 1998); ***Wilcher v. State***, 697 So.2d 1123 (Miss. 1997); ***Ballenger***

53

*v. State*, 667 So.2d 1242 (Miss. 1996). Again, Branch's reliance on the statutory scheme of Arizona is misplaced for the same reasons as discussed in the preceding section.

¶123.    Branch asserts the following:  Under Miss. Code Ann. § 99-19-101, the maximum penalty for capital murder without a sentencing hearing is life imprisonment. *Pham v. State*, 716 So.2d 1100, 1103-04 (Miss. 1998). Where a jury fails to find at least one aggravating factor and a mens rea element, the statutory maximum is life imprisonment. *Berry v. State*, 703 So.2d 269, 284-85 (Miss. 1997); *White v. State*, 532 So.2d 1207, 1219-20 (Miss. 1988); *Gray v. State*, 351 So.2d 1342, 1349 (Miss. 1977). The element serving to elevate the crime to capital murder cannot also serve to elevate the capital crime to a death eligible offense. *See generally Apprendi* and *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 2414, 153 L.Ed.2d 524 (2002).

¶124.    However, this Court has held that evidence of the underlying crime can properly be used to both elevate the crime to capital murder and as an aggravating circumstance. *Goodin v. State*, 787 So.2d 639, 654-55 (Miss. 2001); *Manning v. State*, 735 So.2d 323, 350-51 (Miss. 1999); *Smith v. State*, 729 So.2d 1191, 1223 (Miss. 1998); *Bell v. State*, 725 So.2d 836, 858-59 (Miss. 1998); *Crawford v. State*, 716 So.2d 1028, 1049-50 (Miss. 1998).  Under Miss. Code Ann. § 1-3-4 (Rev. 1998), the maximum punishment of a person convicted of capital murder is death.  Therefore, *Apprendi* is inapplicable because unlike Arizona's statutory scheme that required a finding of an aggravating circumstance to make a defendant death eligible, Mississippi's law defines that convictions of certain crimes render the defendant death eligible.

¶125. Thus, after Branch was convicted of capital murder, he became eligible for the death penalty. The jury then made the appropriate determinations of the ***Enmund*** factors, aggravating and mitigating circumstances and determined that "there are insufficient mitigating circumstances to outweigh the aggravating circumstances, and we further find unanimously that the defendant should suffer death." This issue is without merit.

### XIV. The robbery and pecuniary gain.

¶126. In this assignment of error, Branch asserts that the trial court erred by instructing the jury that "The capital offense was committed for pecuniary gain during the course of a robbery." This, Branch contends, permitted the jury to give double weight to the motive for the robbery in reaching its penalty decision.

¶127. Not only is this issue procedurally barred for Branch's failure to raise this issue in the trial court, this issue is without merit. This exact instruction was found proper in ***Turner v. State***, 732 So.2d 937, 954-55 (Miss. 1999). *See also* ***Irving v. State***, 618 So.2d 58 (Miss. 1992). The argument that this instruction constitutes improper stacking has been rejected in numerous cases. ***Ladner v. State***, 584 So.2d 743, 762-63 (Miss. 1991); ***Nixon v. State***, 533 So.2d 1078, 1097 (Miss. 1987); ***Billiot v. State***, 454 So.2d 445, 465 (Miss. 1984); ***Leatherwood v. State***, 435 So.2d 645, 650 (Miss. 1983); ***Tokman v. State***, 435 So.2d 664, 665 (Miss. 1983); ***Jones v. State***, 517 So.2d 1295, 1300 (Miss. 1987), *vacated on other grounds*, 487 U.S. 1230 (1988).

### XV. The prosecutor comments.

¶128. Branch next asserts as error that the prosecutor committed plain reversible error during his summation at both the guilt and sentencing phases by making improper comments. It is noted that defense

counsel did not make a contemporaneous objection and, therefore, this issue is procedurally barred under *Foster v. State*, 639 So.2d 1263, 1288-89 (Miss. 1994); *Simmons v. State*, 805 So.2d 452, 489 (Miss. 2001) (citing *Davis v. State*, 660 So.2d 1228, 1255 (Miss. 1995)). However, in *Davis*, we said:

> As set forth in *Craft v. State*, 226 Miss. 426, 84 So.2d 531 (1956), the test to determine whether an improper argument by a prosecutor requires reversal is whether the natural and probable effect of the improper argument of the prosecuting attorney is to create an unjust prejudice against the accused as to result in a decision influenced by the prejudice so created.

*Davis v. State*, 530 So.2d 694, 701 (Miss. 1988). Therefore, we shall address the merits of the claim.

¶129. In the guilt phase, according to Branch, the prosecutor argued outside of the evidence by saying that Branch killed Jorden to eliminate her as a witness to the robbery. This, Branch contends was purely speculative, could not reasonably be inferred from the evidence, and had the highly prejudicial effect of injecting an intent element into the jury's deliberation which, as a result "would have rendered the death penalty a more proportionate punishment in the eyes of the jury."

¶130. This Court disagrees. As the State points out, this comment was made during the summation of the guilt phase, not the penalty phase. The evidence showed that Jorden knew Branch and Johnson from living in the same small community, she was a friend of the family, and the two frequently visited her establishment. Additionally, even if the comment were construed as error, it would be harmless in light of the court's instructions that counsel's arguments are not evidence and that if the argument has no basis in the evidence, the jury should disregard the argument. "It is generally presumed that jurors will obey and apply the instructions of the court." *Blue v. State*, 674 So.2d 1184, 1215 (Miss. 1996) (citing *Johnson v. Fargo*, 604 So.2d 306, 311 (Miss. 1992); *Singing River Mall Co. v. Mark Fields, Inc*., 599

56

So.2d 938, 943 (Miss. 1992); *Parker v. Jones County Community Hosp*., 549 So.2d 443, 445-46 (Miss. 1989)) (holding that this jury instruction effectively eradicated any effect . . .may have had on the jury's decision).

¶131.   Then at the sentencing phase, Branch asserts that the prosecutor's words in describing Branch's actions as "especially heinous, atrocious or cruel" mirror the language of the aggravating circumstance contained in Miss. Code Ann. § 99-19-101(5)(h), which was not an aggravating circumstance at issue in this case.  Mr. Hill, in describing the last few minutes of Ms. Jorden's life, said:

> And she lived long enough to know that the end of her time was here.  And one of the people directly responsible for taking her life in one of the most vicious, cold-blooded ways that can be done is that man sitting right over there who hasn't shed a tear over what he has done.

The testimony in this case indicated that Ms. Jorden was conscious during the assault and that considerable force was used in striking the blows to the top of her head.  This was "nothing more than a 'fair comment' on the evidence adduced at trial." *Burns v. State*, 729 So.2d 203, 228 (Miss. 1998).  This case is similar to *Burns* in that both defendants were charged with capital murder with the sole aggravating factor of pecuniary gain.  There, the defendant made the same argument that the prosecutor "was allowed to use undefined aggravators such as "especially heinous" and cruel."  We found:

> The prosecutor did nothing more than refer to the facts of this case. The autopsy report, as discussed before, stated that McBride died from blunt force injuries to the head and neck. This Court recognizes that murders are never kind or gentle. The record before us supports the prosecutor's argument. The prosecutor was simply doing his job in attempting to elicit a death penalty conviction from the jury. This Court has said that "counsel may not, under the guise of argument, state facts that have not been proved by the evidence." *Wells v. State*, 698 So.2d 497, 506 (Miss. 1997) (citing *Pierce v. State*, 289 So.2d 901, 903 (Miss. 1974)). Such was not the case here. A thorough review of the record reveals that all of the prosecutor's comments were supported by the record.

57

Unfortunately, this case is not the first case this Court has been asked to review wherein a defendant, after either stabbing and/or beating the victim to death, was charged with capital murder while in the commission of armed robbery and was sentenced to death. *See* *Wilcher v. State*, 697 So.2d 1087 (Miss. 1997); *Wilcher v. State*, 697 So.2d 1123 (Miss. 1997); *Mack v. State*, 650 So.2d 1289 (Miss. 1994); *Blue v. State*, 674 So.2d 1184 (Miss. 1996); *Conner v. State*, 632 So.2d 1239 (Miss. 1993). This Court can find no difference in the present case and these previously decided cases to warrant a finding that the sentence was disproportionate to the crime committed.

*Burns*, 729 So.2d at 229-30 (¶¶ 134-135).

¶132. Finally, Branch asserts that the prosecutor further improperly invoked religious authority when he said that the Legislature determined that death was the appropriate punishment for someone who killed another and that the Legislature was ordained by God to make that determination. It is noted that the contested remark was made in rebuttal to defense's summation, which the defense's summation is discussed in greater detail under the *Strickland*, *Caldwell*, and *Cronic* discussions above. Among other things, defense counsel told the jury that he believed "life, any life, any detestable life should be taken naturally by God" and that he believed that the jury reserve the death penalty for serial and child killers. Then, the State responded:

> And our Legislature, our laws now in place say that is taking somebody's life with one of these aggravating circumstances present. So there is a line, and our law says one life is enough. He has only got to kill and take one person's life, and that's the way it ought to be because then we would say, Well Ms. Dot's life, that ain't valuable enough to give him the death penalty. He is going to have to kill two people which -- do you see the fallacy of where that goes? That just doesn't work, and besides, it just doesn't feel right to say you have got to kill a child; that a grandmama's [sic] life because she is 57, her life is not worth as much. It's not enough penalty. It's not enough deed to do for the penalty. That doesn't work. We have our lives. That is our innate gift, and nobody can take that life just to be taking it.
>
> Now we are in a different situation. Our governments are ordained by our creator, and a duly constituted body like this has the authority, as well it should; it has not just the

58

authority; it has the duty to impose the proper and just punishment, a balanced thing. Agreed, it's a balancing. We are here. That's what we are doing.

It appears to be the reference to "our creator" that Branch now complains. This is not the first time this Court has addressed a prosecutor's use of biblical references. In *Berry v. State*, 703 So.2d 269, 281 (¶ 34) (Miss. 1997), we reviewed a prosecutor's use of the Bible to show that Berry's psychological problems were not special because they have been around since Biblical times. In relying on *Carr v. State*, 655 So.2d 824 (Miss. 1995), we stated:

> We accepted the use of Biblical references in closing arguments. There the Court declared that
>
>> [t]his Court has continually held that counsel is afforded broad latitude in closing argument. This latitude, set out by the Court in *Nelms & Blum Co. v. Fink*, 159 Miss. 372, 382-383, 131 So. 817, 820 (1930), has been referred to in the context of capital cases. In *Nelms*, we stated that "[c]ounsel may draw upon literature, history, science, religion, and philosophy for material for his argument." Id. at 382-384, 131 So. 817. See *Hansen v. State*, 592 So.2d 114, 139-140 (Miss. 1991); *Shell v. State*, 554 So.2d 887, 899 (Miss. 1989), vacated on other grounds, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Johnson v. State*, 416 So.2d 383, 391 (Miss. 1982).

*Berry,* 703 So.2d at 281 (¶ 34) (citing *Carr*, 655 So.2d at 853). We also addressed this issue last year and held:

> Alternatively, this Court has held that arguments with scriptural, religious or biblical references are proper subjects for comment during closing, especially when they are responsive to those of defense counsel. *Berry v. State*, 703 So.2d 269, 281 (Miss. 1997); *Carr v. State*, 655 So.2d 824, 853 (Miss. 1995); *Hansen v. State*, 592 So.2d 114, 139-40 (Miss. 1991); *Shell v. State*, 554 So.2d 887, 899 (Miss. 1989) *rev'd on other grounds*, 498 U.S. 1, 111 S.Ct. 313, 112 L.Ed.2d 1 (1990); *Nixon v. State*, 533 So.2d 1078, 1100-01 (Miss. 1987), *overruled on other grounds*, *Wharton v. State*, 734 So.2d 985 (Miss.1998). During the defense closing, the record reflects that Jackson's counsel made religious-based arguments.

59

*Jackson v. State*, 860 So.2d 653, 672 (¶ 72) (Miss. 2003).

¶133.  Because the prosecutor's remarks were responsive to defense counsel's remarks in summation, this issue is without merit.

### XVI.  The sentencing options available under Miss. Code Ann. §§ 97-3-21 and 99-19-101.

¶134.  Branch next asserts that the trial court erred when it failed to advise the jury of the three sentencing options of life imprisonment, life without parole, and death.  Had the jury been advised of the third option, life imprisonment with the possibility of parole, psychologically the jury is more likely to choose life without parole as middle ground rather than the most lenient of the given two choices.

¶135.  Miss. Code Ann. § 97-3-21 (1994) provides:

> Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.
> Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Miss. Code Ann. § 99-19-101(1) (1994) provides:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, life imprisonment without eligibility for parole, or life imprisonment. The proceeding shall be conducted by the trial judge before the trial jury as soon as practicable. If, through impossibility or inability, the trial jury is unable to reconvene for a hearing on the issue of penalty, having determined the guilt of the accused, the trial judge may summon a jury to determine the issue of the imposition of the penalty. If the trial jury has been waived, or if the defendant pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose or may be conducted before the trial judge sitting without a jury if both the State of Mississippi and the defendant agree thereto in writing. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence, and shall include matters relating to any of the aggravating or mitigating circumstances. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the

Constitutions of the United States or of the State of Mississippi. The state and the defendant and/or his counsel shall be permitted to present arguments for or against the sentence of death.

Miss. Code Ann. § 47-7-3(1)(f) provides that "no person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101."

¶136. In *Pham v. State*, 716 So.2d 1100, 1103 (Miss. 1998), the State was not seeking the death penalty in this capital murder case. As to the sentencing options, this Court held that "the only possible sentence for conviction of capital murder committed after July 1, 1994, the effective date of § 47-7-3, is life without parole; and, this is the only sentence which the jury could have given Pham." We again revisited the sentencing options afforded a capital murder defendant in *Flowers v. State*, 842 So.2d 531 (Miss. 2003), and noted that § 47-7-3(1)(f) denies parole eligibility to any person "charged, tried, convicted, and sentenced to life imprisonment under the provisions of Section 99-19-101." *Flowers*, 842 So.2d at 540.

¶137. This issue is without merit.

### XVII. Aggregate error.

¶138. Branch next asserts that the aggregate effect of the variety of errors raised in this appeal requires reversal. We note that in the discussion on each of the preceding sections, we have found each assignment of error to be without merit. Having so found in today's case that each of the foregoing assignments of error are without merit, we thus find that there was no cumulative error. *Byrom v. State*, 863 So.2d 836, 847 (Miss. 2003); *McFee v. State*, 511 So.2d 130, 136 (Miss. 1987).

### XVIII. Facial Constitutionality of Miss. Code Ann. § 99-19-101.

¶139. Branch next asserts that the capital sentencing mechanism of the State of Mississippi is facially unconstitutional in that the death penalty constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. Without argument, Branch cites: *Callings v. Collins*, 510 U.S. 1141, 1143-1159, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting); *Gregg v. Georgia*, 428 U.S. 153, 227-241, 96 S.Ct. 2909, 49 L.Ed.2d 435 (1976) (Brennan, J., dissenting); *Furman v. Georgia*, 408 U.S. 238, 240-57, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Douglas, J., concurring); *Rudolph v. Alabama*, 375 U.S. 889, 889-91, 84 S.Ct. 155, 11 L.Ed.2d 119 (1963) (Goldberg, J., dissenting from denial of certiorari); and *United States v. DeCosta*, 624 F.2d 196, 266 (D.C. Cir. 1979) (Bazelon, J., dissenting).

¶140. This issue is procedurally barred because this issue was not raised in the trial court. *Moawad v. State*, 531 So.2d 632, 634 (Miss. 1988); *Howard v. State*, 507 So.2d 58, 63 (Miss. 1987); *Walker v. State*, 823 So.2d 557 (Miss. Ct. App. 2002). This procedural bar notwithstanding, this issue is without merit. Miss. Code Ann. § 99-19-101 has already been determined to be constitutional in numerous cases. *Edwards v. State*, 737 So.2d 275, 307 (Miss. 1999); *Billiott v. State*, 454 So.2d 445, 464 (Miss. 1984); *Coleman v. State*, 378 So.2d 640, 647 (Miss. 1979); *Edwards v. State*, 441 So.2d 84, 90 (Miss. 1983).

¶141. Therefore, not only is this issue procedurally barred, it is also without merit.

## XIX. The evidence adduced at trial.

¶142. In his final issue, Branch asserts that the capital murder conviction was not supported by the evidence and that the trial court erred in denying his request for a directed verdict. Again, without much

discussion, Branch cites the following cases: *Tait v. State*, 669 So.2d 85, 88 (Miss. 1996); *Smith v. State*, 646 So.2d 538, 542 (Miss. 1994); *May v. State*, 460 So.2d 778, 781 (Miss. 1994); *Glass v. State*, 278 So.2d 384, 386 (Miss. 1973); and *Holmes v. State*, 660 So.2d 1225, 1227 (Miss. 1995).

¶143.   The standard of review for the denial of a directed verdict requires this Court to view all of the evidence, not just that which supports the case for the prosecution, in a light most favorable to the jury's verdict and that we may reverse only when the evidence is such that  reasonable and fair-minded jurors could only find the accused guilty. *McDowell v. State*, 807 So.2d 413, 425-26 (Miss. 2001).  As the State points out, the jury was presented with two versions of what happened: Branch's version at trial which included police coercion or Branch's version on the videotape.  The evidence includes the testimony of the witnesses who saw Branch and Johnson together throughout the evening, the blood evidence, the items found at Johnson's home, and Branch's confession.  Reasonable, fair-minded jurors could find beyond a reasonable doubt that Branch was guilty of robbery and capital murder.

¶144.   This issue is without merit.

## CONCLUSION

¶145.   Based upon the foregoing analysis, we affirm the jury's guilty verdict for the capital murder of Dorothy Jorden and imposition of the death penalty upon Lawrence Branch in  the Carroll County Circuit Court's final judgment.

¶146. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF DEATH BY LETHAL INJECTION, AFFIRMED.**

   **SMITH, C.J., WALLER AND COBB, P.JJ., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR.  DIAZ AND GRAVES, JJ., NOT PARTICIPATING.**

# APPENDIX
## DEATH CASES AFFIRMED BY THIS COURT

*Byrom v. State,* --- So.2d --- (Miss. 2004).

*Howell v. State,* 860 So.2d 704 (Miss. 2003).

*Howard v. State,* 853 So.2d 781 (Miss. 2003).

*Walker v. State,* 815 So.2d 1209 (Miss. 2002). *following remand.

*Bishop v. State,* 812 So.2d 934 (Miss. 2002).

*Stevens v. State,* 806 So.2d 1031 (Miss. 2002).

*Grayson v. State,* 806 So.2d 241 (Miss. 2002).

*Knox v. State,* 805 So.2d 527 (Miss. 2002).

*Simmons v. State,* 805 So.2d 452 (Miss. 2002).

*Berry v. State,* 802 So.2d 1033 (Miss. 2001).

*Snow v. State*,  800 So.2d 472 (Miss. 2001).

*Mitchell v. State,* 792 So.2d 192 (Miss. 2001).

*Puckett v. State,* 788 So.2d 752 (Miss. 2001). * following remand.

*Goodin v. State,*  787 So.2d 639 (Miss. 2001).

*Jordan v. State,* 786 So.2d 987 (Miss. 2001).

*Manning v. State,* 765 So.2d 516 (Miss. 2000). *following remand.

*Eskridge v. State,* 765 So.2d 508 (Miss. 2000).

*McGilberry v. State,* 741 So. 2d 894 (Miss. 1999)**.**

*Puckett v. State,* 737 So. 2d 322 (Miss. 1999).        *remanded for *Batson* hearing.

*Manning v. State,* 735 So. 2d 323 (Miss. 1999). *remanded for *Batson* hearing.

*Hughes v. State,* 735 So. 2d 238 (Miss. 1999).

*Turner v. State,* 732 So. 2d 937 (Miss. 1999).

*Smith v. State,* 729 So. 2d 1191 (Miss. 1998).

*Burns v. State,* 729 So. 2d 203 (Miss. 1998).

*Jordan v. State,* 728 So. 2d 1088 (Miss. 1998).

*Gray v. State,* 728 So. 2d 36 (Miss. 1998).

*Manning v. State,* 726 So. 2d 1152 (Miss. 1998).

*Woodward v. State,* 726 So. 2d 524 (Miss. 1997).

*Bell v. State,* 725 So. 2d 836 (Miss. 1998).

*Evans v. State,* 725 So. 2d 613 (Miss. 1997).

*Brewer v. State,* 725 So. 2d 106 (Miss. 1998).

*Crawford v. State,* 716 So. 2d 1028 (Miss. 1998).

*Doss v. State,* 709 So. 2d 369 (Miss. 1996).

*Underwood v. State,* 708 So. 2d 18 (Miss. 1998).

*Holland v. State,* 705 So. 2d 307 (Miss. 1997).

*Wells v. State,* 698 So. 2d 497 (Miss. 1997).

*Wilcher v. State,* 697 So. 2d 1087 (Miss. 1997).

*Wiley v. State,* 691 So. 2d 959 (Miss. 1997).

*Brown v. State*, 690 So. 2d 276 (Miss. 1996).

*Simon v. State*, 688 So. 2d 791 (Miss.1997).

*Jackson v. State*, 684 So. 2d 1213 (Miss. 1996).

*Williams v. State,* 684 So. 2d 1179 (Miss. 1996).

*Davis v. State,* 684 So. 2d 643 (Miss. 1996).

*Taylor v. State*, 682 So. 2d. 359 (Miss. 1996).

*Brown v. State*, 682 So. 2d 340 (Miss. 1996).

*Blue v. State*, 674 So. 2d 1184 (Miss. 1996).

*Holly v. State*, 671 So. 2d 32 (Miss. 1996).

*Walker v. State*, 671 So. 2d 581(Miss. 1995).

*Russell v. State*, 670 So. 2d 816 (Miss. 1995).

*Ballenger v. State*, 667 So. 2d 1242 (Miss. 1995).

# DEATH CASES AFFIRMED BY THIS COURT

## (continued)

*Davis v. State*, 660 So. 2d 1228 (Miss. 1995).

*Carr v. State*, 655 So. 2d 824 (Miss. 1995).

*Mack v. State*, 650 So. 2d 1289 (Miss. 1994).

*Chase v. State*, 645 So. 2d 829 (Miss. 1994).

*Foster v. State*, 639 So. 2d 1263 (Miss. 1994).

*Conner v. State*, 632 So. 2d 1239 (Miss. 1993).

*Hansen v. State*, 592 So. 2d 114 (Miss. 1991).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State*, 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*Davis v. State*, 551 So. 2d  165 (Miss. 1989).

*Minnick v. State*, 551 So. 2d 77 (Miss. 1989).

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi*, 494 U.S. 1075 (1990) vacating and remanding *Pinkney v. State*, 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*Woodward v. State*, 533 So. 2d 418 (Miss. 1988).

*Nixon v. State*, 533 So. 2d 1078 (Miss. 1987).

*Cole v. State*, 525 So. 2d 365 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1346 (Miss. 1987).

*Lockett v. State*, 517 So. 2d 1317 (Miss. 1987).

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987).

## DEATH CASES AFFIRMED BY THIS COURT
### (continued)

**\*Jones v. State**, 517 So. 2d 1295 (Miss. 1987)**, Jones v. Mississippi**, 487 U.S. 1230 (1988) vacating and remanding, **Jones v. State**, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Wiley v. State*, 484 So. 2d 339 (Miss. 1986).

*Johnson v. State*, 477 So. 2d 196 (Miss. 1985).

*Gray v. State*, 472 So. 2d 409 (Miss. 1985).

*Cabello v. State*, 471 So. 2d 332 (Miss. 1985).

*Jordan v. State*, 464 So. 2d 475 (Miss. 1985).

*Wilcher v. State*, 455 So. 2d 727 (Miss. 1984).

*Billiot v. State*, 454 So. 2d 445 (Miss. 1984).

*Stringer v. State*, 454 So. 2d 468 (Miss. 1984).

*Dufour v. State*, 453 So. 2d 337 (Miss. 1984).

*Neal v. State*, 451 So. 2d 743 (Miss. 1984).

*Booker v. State*, 449 So. 2d 209 (Miss. 1984).

*Wilcher v. State*, 448 So. 2d 927 (Miss. 1984).

*Caldwell v. State*, 443 So. 2d 806 (Miss. 1983).

*Irving v. State*, 441 So. 2d 846 (Miss. 1983).

*Tokman v. State*, 435 So. 2d 664 (Miss. 1983).

*Leatherwood v. State*, 435 So. 2d 645 (Miss. 1983).

*Hill v. State*, 432 So. 2d 427 (Miss. 1983).

*Pruett v. State*, 431 So. 2d 1101 (Miss. 1983).

*Gilliard v. State*, 428 So. 2d 576 (Miss. 1983).

*Evans v. State*, 422 So. 2d 737 (Miss. 1982).

## DEATH CASES AFFIRMED BY THIS COURT

### (continued)

*King v. State*, 421 So. 2d 1009 (Miss. 1982).

*Wheat v. State*, 420 So. 2d 229 (Miss. 1982).

*Smith v. State*, 419 So. 2d 563 (Miss. 1982).

*Johnson v. State*, 416 So. 2d 383 (Miss.1982).

*Edwards v. State*, 413 So. 2d 1007 (Miss. 1982).

*Bullock v. State*, 391 So. 2d 601 (Miss. 1980).

*Reddix v. State*, 381 So. 2d 999 (Miss. 1980).

*Jones v. State*, 381 So. 2d 983 (Miss. 1980).

*Culberson v. State*, 379 So. 2d 499 (Miss. 1979).

*Gray v. State*, 375 So. 2d 994 (Miss. 1979).

*Jordan v. State*, 365 So. 2d 1198 (Miss. 1978).

*Voyles v. State*, 362 So. 2d 1236 (Miss. 1978).

*Irving v. State*, 361 So. 2d 1360 (Miss. 1978).

*Washington v. State*, 361 So. 2d 6l (Miss. 1978).

*Bell v. State*, 360 So. 2d 1206 (Miss. 1978).

   * Case was originally affirmed in this Court but on remand from U. S. Supreme  Court, case was remanded by this Court for a new sentencing hearing.

**DEATH CASES REVERSED AS TO GUILT PHASE**
**AND SENTENCE PHASE**

*Flowers v. State,* 842 So.2d 531 (Miss. 2003).

*Randall v. State,* 806 So. 2d 185 (Miss. 2002).

*Flowers v. State,* 773 So.2d 309 (Miss. 2000).

*Edwards v. State,* 737 So. 2d 275 (Miss. 1999).

*Smith v. State,* 733 So. 2d 793 (Miss. 1999).

*Porter v. State,* 732 So.2d 899 (Miss. 1999).

*Kolberg v. State,* 704 So. 2d 1307 (Miss. 1997).

*Snelson v. State,* 704 So. 2d 452 (Miss. 1997).

*Fusilier v. State,* 702 So. 2d 388 (Miss. 1997).

*Howard v. State,* 701 So. 2d 274 (Miss. 1997).

*Lester v. State,* 692 So. 2d 755 (Miss. 1997).

*Hunter v. State*, 684 So. 2d 625 (Miss. 1996).

*Lanier v. State*, 684 So. 2d 93 (Miss. 1996).

*Giles v. State*, 650 So. 2d 846 (Miss. 1995).

*Duplantis v. State*, 644 So. 2d 1235 (Miss. 1994).

*Harrison v. State*, 635 So. 2d 894 (Miss. 1994).

*Butler v. State*, 608 So. 2d 314 (Miss. 1992).

*Jenkins v. State*, 607 So. 2d 1171 (Miss. 1992).

*Abram v. State*, 606 So. 2d 1015 (Miss. 1992).

*Balfour v. State*, 598 So. 2d 731 (Miss. 1992).

*Griffin v. State*, 557 So. 2d 542 (Miss. 1990).

*Bevill v. State*, 556 So. 2d 699 (Miss. 1990).

*West v. State*, 553 So. 2d 8 (Miss. 1989).

*Leatherwood v. State*, 548 So. 2d 389 (Miss. 1989).

*Mease v. State*, 539 So. 2d 1324 (Miss. 1989).

**DEATH CASES REVERSED AS TO GUILT PHASE**
**AND SENTENCE PHASE**
(**continued**)

*Houston v. State*, 531 So. 2d 598 (Miss. 1988).

*West v. State*, 519 So. 2d 418 (Miss. 1988).

*Davis v. State*, 512 So. 2d 129l (Miss. 1987).

*Williamson v. State*, 512 So. 2d 868 (Miss. 1987).

*Foster v. State*, 508 So. 2d 1111 (Miss. 1987).

*Smith v. State*, 499 So. 2d 750 (Miss. 1986).

*West v. State*, 485 So. 2d 681 (Miss. 1985).

*Fisher v. State*, 481 So. 2d 203 (Miss. 1985).

*Johnson v. State*, 476 So. 2d 1195 (Miss. 1985).

*Fuselier v. State*, 468 So. 2d 45 (Miss. 1985).

*West v. State*, 463 So. 2d 1048 (Miss. 1985).

*Jones v. State*, 461 So. 2d 686 (Miss. 1984).

*Moffett v. State*, 456 So. 2d 714 (Miss. 1984).

*Lanier v. State*, 450 So. 2d 69 (Miss. 1984).

*Laney v. State*, 421 So. 2d 1216 (Miss. 1982).

## DEATH CASES REVERSED
## AS TO PUNISHMENT AND REMANDED
## FOR RESENTENCING TO LIFE IMPRISONMENT

*Reddix v. State*, 547 So. 2d 792 (Miss. 1989).

*Wheeler v. State*, 536 So. 2d 1341 (Miss. 1988).

*White v. State*, 532 So. 2d 1207 (Miss. 1988).

*Bullock v. State*, 525 So. 2d 764 (Miss. 1987).

*Edwards v. State*, 441 So. 2d 84 (Miss. l983).

*Dycus v. State*, 440 So. 2d 246 (Miss. 1983).

*Coleman v. State*, 378 So. 2d 640 (Miss. 1979).

# DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL <u>ON SENTENCING PHASE ONLY</u>

*King v. State,* 784 So.2d 884 (Miss. 2001).

*Walker v. State,* 740 So.2d 873 (Miss. 1999).

*Watts v. State,* 733 So.2d 214 (Miss. 1999).

*West v. State,* 725 So. 2d 872 (Miss. 1998).

*Smith v. State*, 724 So. 2d 280 (Miss. 1998).

*Berry v. State,* 703 So. 2d 269 (Miss. 1997).

*Booker v. State*, 699 So. 2d 132 (Miss. 1997).

*Taylor v. State*, 672 So. 2d 1246 (Miss. 1996).

*\*Shell v. State*, 554 So. 2d 887 (Miss. 1989), *Shell v. Mississippi*, 498 U.S. 1 (1990) reversing, in part, and remanding, *Shell v. State* 595 So. 2d 1323 (Miss. 1992) remanding for new sentencing hearing.

*\*Pinkney v. State*, 538 So. 2d 329 (Miss. 1989), *Pinkney v. Mississippi,* 494 U.S. 1075 (1990) vacating and remanding, *Pinkney v. State,* 602 So. 2d 1177 (Miss. 1992) remanding for new sentencing hearing.

*\*Clemons v. State*, 535 So. 2d 1354 (Miss. 1988), *Clemons v. Mississippi*, 494 U.S. 738 (1990) vacating and remanding, *Clemons v. State*, 593 So. 2d 1004 (Miss. 1992) remanding for new sentencing hearing.

*\*Jones v. State*, 517 So. 2d 1295 (Miss. 1987), *Jones v. Mississippi,* 487 U.S. 1230 (1988) vacating and remanding, *Jones v. State*, 602 So. 2d 1170 (Miss. 1992) remanding for new sentencing hearing.

*Russell v. State*, 607 So. 2d 1107 (Miss. 1992).

*Holland v. State*, 587 So. 2d 848 (Miss. 1991).

*Willie v. State*, 585 So. 2d 660 (Miss. 1991).

*Ladner v. State*, 584 So. 2d 743 (Miss. 1991).

*Mackbee v. State*, 575 So. 2d 16 (Miss. 1990).

# DEATH CASES REVERSED AS TO
# PUNISHMENT AND REMANDED FOR A NEW TRIAL
# ON SENTENCING PHASE ONLY
## (continued)

*Berry v. State*, 575 So. 2d 1 (Miss. 1990).

*Turner v. State*, 573 So. 2d 657 (Miss. 1990).

*State v. Tokman*, 564 So. 2d 1339 (Miss. 1990).

*Johnson v. State*, 547 So. 2d 59 (Miss. 1989).

*Williams v. State*, 544 So. 2d 782 (Miss. 1989); *sentence aff'd* 684 So. 2d 1179 (1996).

*Lanier v. State*, 533 So. 2d 473 (Miss. 1988).

*Stringer v. State*, 500 So. 2d 928 (Miss. 1986).

*Pinkton v. State*, 481 So. 2d 306 (Miss. 1985).

*Mhoon v. State*, 464 So. 2d 77 (Miss. 1985).

*Cannaday v. State*, 455 So. 2d 713 (Miss. 1984).

*Wiley v. State*, 449 So. 2d 756 (Miss. 1984); resentencing affirmed, *Wiley v. State*, 484 So. 2d 339 (Miss. 1986), *cert. denied* *Wiley v. Mississippi*, 479 U.S. 1036 (1988); resentencing ordered, *Wiley v. State,* 635 So. 2d 802 (Miss. 1993) following writ of habeas corpus issued pursuant to *Wiley v. Puckett*, 969 So. 2d 86, 105-106 (5th Cir. 1992); resentencing affirmed, *Wiley v. State*, 95-DP-00149, February 13, 1997 (rehearing pending).

*Williams v. State*, 445 So. 2d 798 (Miss. 1984).  * Case was originally affirmed in this Court but on remand from U. S. Supreme Court, case was remanded by this Court for a new sentencing hearing.